# EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

WESTERN DIVISION

BRIAN WURZEL,                    )
                                 )
                                 )
          Plaintiff,             )
                                 )
     vs.                         )  Case No.  3:09CV498
                                 )
WHIRLPOOL CORPORATION,           )   Judge Carr
                                 )
                                 )
          Defendant.             )

- - -

VIDEOTAPED DEPOSITION OF BRIAN WURZEL


DATE:        September 10, 2009 at 9:27 a.m.

PLACE:       Anspach Meeks Ellenberger
             300 Madison Avenue
             Suite 1600
             Toledo, Ohio

REPORTER:    Casey G. Schreiner, RMR-RDR
             Notary Public


- - -

1        A.      Boat mechanic.

2        Q.      Which marinas?

3        A.      Happy Days, Drawbridge, Lakeshore, and

4   one that was new.  I can't remember the name of it.

5        Q.      Did you actually fill out an application

6   there?

7        A.      Yes, I did.

8        Q.      At all three?

9        A.      Yes -- well, four, really.

10       Q.      And have you heard back on any of those

11  jobs?

12       A.      No, I haven't.

13       Q.      Did you have interviews at any of them?

14       A.      No, I haven't.

15       Q.      So it was just a matter of you filling

16  out the application and turning it in?

17       A.      That's correct.

18       Q.      Was there any inquiry or discussion,

19  either in the application or when you turned it in,

20  about your heart condition?

21       A.      No.

22       Q.      So no mention of that?

23       A.      No.

24       Q.      All right.  You started working at

25  Whirlpool in March of 1983; is that right?

12412258-b285-41c0-91c9-798eb95cf0a6

1      A.      That's correct.

2      Q.      And how did you find out about the job?

3      A.      My father worked there, and they were

4   advertising in the paper.

5      Q.      And what job did you start out in?

6      A.      An assembler.

7      Q.      And how long did you do that job?

8      A.      To the best of my knowledge, it was two

9   years.

10      Q.      Two years?

11      A.      Yes.

12      Q.      And where did you go from there?

13      A.      To the machine shop.

14      Q.      In what position?

15      A.      Assembly and running machines.

16      Q.      And how long did you stay there?

17      A.      It's been a while ago.  I can't really

18   recall the time frame.

19      Q.      Your best estimate.

20      A.      Between cutbacks, I would say five years.

21      Q.      Okay.  Where did you go then?

22      A.      They moved me to plastics during a

23   cutback.

24      Q.      Again, as an assembler?

25      A.      I was unloading the plastics press.

12412258-b285-41c0-91c9-798eb95cf0a6

1      Q.    Now, sir, what is the medical condition

2  from which you suffer?

3      A.    Prinzmetal's angina.

4      Q.    All right.  And it's my understanding

5  that was diagnosed in November of 2007; is that right?

6      A.    Correct.

7      Q.    And who diagnosed that?

8      A.    Dr. Stockton is who performed the

9  catheterization, if I'm not mistaken.

10     Q.    What's your -- so he's the one -- you say

11 he performed the catheterization.  Is he also the one

12 who diagnosed it?

13     A.    During the catheterization, I had a

14 spasm, they thought it was a blockage of my artery.  I

15 was given medication, and I was sent to a -- I'm not

16 sure of the physician's name to have stents put in.

17 By the time I got to the other site for the other

18 physician, my arteries were unblocked.  That's when it

19 was diagnosed as to what I had.

20     Q.    What is your understanding as to what

21 Prinzmetal angina is?

22     A.    My veins in my heart spasm shut.

23     Q.    And by "spasm," do you mean

24 contracting --

25     A.    That's correct.

12412258-b285-41c0-91c9-798eb95cf0a6

1    Q.    -- or closing?

2    A.    Correct.

3    Q.    And what treatment have you received with

4    respect to that condition since diagnosis?

5    A.    I'm not sure I understand what you mean.

6    Q.    Okay.  You -- for example, you said that

7    you're currently taking Procardia, right?

8    A.    That's correct.

9    Q.    And that you take nitroglycerin pills as

10   required?

11   A.    Right.

12   Q.    And I -- and by "as required," does that

13   mean that when you have an angina attack, you can use

14   the nitroglycerin to attempt to alleviate the symptoms

15   of the attack?

16   A.    That's correct.

17   Q.    All right.  Is there any other treatment

18   that you receive for the -- for the angina, whether it

19   be through medication or some other form of assistance

20   device or physical therapy, anything like that?

21   A.    No.

22   Q.    So the only form of treatment that you

23   have received for this condition from its inception

24   has been medication?

25   A.    That's correct.

1        Q.    And the second?

2        A.    Karen.

3        Q.    Okay.  All right.  Okay.  Back to what we

4 were talking about.  Does the angina have any impact

5 on your daily life?

6        A.    Can you be more specific?

7        Q.    I can try to be.  Does it limit you in

8 any way from doing anything?

9        A.    No.

10       Q.    Nothing at all?

11       A.    Only when I have a spasm, and it depends

12 on the severity.

13       Q.    But if -- if no spasm is occurring, if

14 I'm understanding you correctly, you live your life

15 normally and without any limitations whatsoever; is

16 that correct?

17       A.    That's correct.

18       Q.    And what happened -- and when you say

19 "spasm," is that the same as if we were to say you

20 were having an angina attack?

21       A.    That's correct.

22       Q.    All right.  And what happens when you

23 have an angina attack?

24       A.    Tightness in my chest, shortness of

25 breath, numbness of my left arm, pain in my neck.

12412258-b285-41c0-91c9-798eb95cf0a6

1    Almost symptomatic of a heart attack.

2          Q.    Dizziness?

3          A.    At times, yes.

4          Q.    Fatigue?

5          A.    Depending on the severity.

6          Q.    Nausea?

7          A.    No.

8          Q.    When you say tightness in your chest, I

9    assume that is also pain?

10         A.    Right.

11         Q.    Anything else in terms of symptoms of an

12   attack?

13         A.    No.

14         Q.    So you described tightness or pain in the

15   chest, shortness of breath, numbness in your left arm,

16   pain in your neck, dizziness, fatigue.  Is that the

17   full extent of the symptoms that you experience?

18         A.    Yes.  Yes, it is.

19         Q.    Okay.  One other rule of thumb for

20   taking -- or giving a deposition, which I forgot to

21   cover, and I apologize right now, and this is a normal

22   thing as well.

23                Oftentimes, you know what I'm asking you

24   before I finish asking it, and what happens is you

25   wind up answering the question in the middle of me

1   nitroglycerin pills you may need to alleviate the

2   symptoms?

3          A.    I know if I need more than three, I'm in

4   trouble.

5          Q.    You're in trouble.  Have you ever had to

6   take more than three?

7          A.    No.

8          Q.    So is it -- are you saying, then, that

9   the nitroglycerin pills have always -- you've always

10  been able to alleviate or eliminate the symptoms

11  through the use of nitroglycerin?

12         A.    Yes.

13         Q.    Now, the -- the Prinzmetal angina, that's

14  the condition that you've identified in relation to

15  this lawsuit, right?

16         A.    That's correct.

17         Q.    Do you believe that you have a disability

18  with respect to your Prinzmetal angina?

19         A.    I wouldn't call it a disability.  I would

20  call it, consider it a medical condition.

21         Q.    But am I to understand that you do not

22  believe that you are disabled; is that right?

23         A.    No.

24         Q.    Am I right or wrong in that?

25         A.    I believe I'm not disabled.

Page 42

1       Q.      So you believe you are not disabled; is

2   that correct?

3       A.      Right.

4       Q.      You just have a medical condition?

5       A.      That's correct.

6       Q.      And when you say you're not disabled,

7   what do you mean by "disabled"?

8       A.      I can perform normal, everyday functions.

9   It's just when my medical condition flares up, I have

10  to take some time.

11      Q.      How much time?

12      A.      Depending on the severity, it can be 10

13  minutes; or if it's a severe spasm, sometimes I lay

14  down and take a nap.

15                      MR. WIT:  Can you stamp that as

16                      3.

17                      (Court Reporter marked

18                      Defendant's Exhibit 3.)

19  BY MR. WIT:

20      Q.      Is "Wurzel" or "Wurtzel"?

21      A.      "Wurzel."

22      Q.      Mr. Wurzel, I'm handing you what has been

23  marked as Defendant's Exhibit 3, which is a record

24  from a visit to the emergency room at Bellevue

25  Hospital on April 20, 2003.

12412258-b285-41c0-91c9-798eb95cf0a6

Page 43

1    Do you recall going to the emergency room
2  on this date?

3    A.    Yes.

4    Q.    All right.  And this was a visit to the
5  emergency room, as you can see, because of chest pain?

6    A.    That is correct.

7    Q.    Does this visit to the ER reflect the
8  first time that you experienced chest pain to such a
9  degree that you sought medical attention?

10    A.    Yes, it is.

11    Q.    So we can identify April 20, 2003, as the
12  onset of your heart condition?

13    A.    That's correct.

14    Q.    All right.  Do you know, what is -- were
15  the problems you were having chest pain-wise, was that
16  ever diagnosed as a heart attack?

17    A.    To the best of my knowledge, all the
18  tests confirmed that it was not a heart attack.

19    Q.    No.  Have you ever described your
20  problems as such, as being a heart attack?

21    A.    Until I was diagnosed with what I had, I
22  was -- I would say it was heart attack-feeling
23  symptoms.

24    Q.    Okay.  But I guess what I'm asking you,
25  did you ever tell anyone that you had had a heart

12412258-b285-41c0-91c9-798eb95cf0a6

1      A.    I couldn't really tell you.

2      Q.    What was it the last time you held the

3  job?

4      A.    If I'm not mistaken, it was around 18

5  dollars an hour.

6      Q.    Had you received any raises from the time

7  when you left the position versus when you took the

8  job?

9      A.    I'm not --

10      Q.    Were there -- did you receive any raises

11  in pay while you were a forklift operator?

12      A.    Yes.  Everybody received yearly raises.

13      Q.    Okay.  And when you're a materials

14  handler, are you operating a forklift full time?

15      A.    My job at that position was to take boxes

16  of literature out to a subassembly area.  So at times

17  I would remove boxes from shelves, restock the boxes

18  in the morning, haul the boxes out, help unload

19  trucks, stack pallets into storage racks.  It

20  contained numerous functions.

21      Q.    How much time on a daily basis do you

22  think you spent operating the forklift?

23      A.    Out of eight hours, I would guesstimate

24  five to five-and-a-half hours.

25      Q.    And for the remaining time that you spent

1    working, including breaks, of course, you're, as I

2    understand it, either moving boxes, packing boxes, or

3    unpacking boxes?

4          A.    That's correct.

5          Q.    And how much do these boxes weigh?

6          A.    They varied from 1 pound to 35 pounds.

7          Q.    Where are you moving them?

8          A.    I was moving them from storage shelves,

9    packing them on a skid and transporting them off to a

10   subassembly area for information packets for the units

11   being produced.

12         Q.    All right.  So if we take your job from

13   the first step to the last step, as I understand it,

14   your responsibility is to pack literature into a box

15   that's contained in storage in a warehouse; that's

16   step one, right?

17         A.    My morning began, I would come in; I

18   would have skids of literature that they received on

19   midnight shift sitting on the floor.  I would take

20   them and put them into the shelves in their proper

21   storage areas.

22               When I was done with that, I would go and

23   do what they consider line returns.  That's literature

24   that the shift before didn't use.  I would bring them

25   back and put them in the storage -- their proper

1  storage areas.

2      Q.    And this is done on a forklift, or not?

3      A.    That's correct.

4      Q.    Okay.

5      A.    Except for when I was individually

6  putting boxes in the shelves, I would get off the

7  forklift and physically lift them into position.

8      Q.    And the literature that we're talking

9  about are basically the product information booklets

10  that come with the product; is that right?

11      A.    That's correct, use and care guides.

12      Q.    And the product in question is what?

13      A.    Washing machines.

14      Q.    And you're transporting the literature,

15  which is contained in boxes, and the boxes are on a

16  skid, from the warehouse to a subassembly area --

17      A.    That's correct.

18      Q.    -- using the forklift?

19      A.    That's correct.

20      Q.    All right.  And so you're moving from the

21  warehouse to the plant floor?

22      A.    That's correct.

23      Q.    And back and forth?

24      A.    That's correct.

25      Q.    And there are people throughout the areas

12412258-b285-41c0-91c9-798eb95cf0a6

1   where you're driving, right?

2          A.   That's correct.

3          Q.   A lot of people?

4          A.   Uh-huh, correct.

5          Q.   And there's no -- as I understand it, no

6   type of physical divider that separates you on your

7   forklift from the pedestrians walking throughout the

8   plant, right?

9          A.   That's correct.

10          Q.   Basically, there are two lines and you're

11   supposed to drive in between the two lines; is that

12   right?

13          A.   That's correct.

14          Q.   All right.  And how fast is the forklift

15   you generally drive?

16          A.   I would say between 5 and 7 miles per

17   hour, top speed.  They were governed to not exceed a

18   certain speed.  What that was, I'm not a hundred

19   percent sure.

20          Q.   Did you have to receive any training in

21   terms of how to drive a forklift?

22          A.   Yes, I did.

23          Q.   And I would assume you received that at

24   the time you were awarded the position?

25          A.   I received the training back in 1998 or

Page 54

1    license and when it was renewed?

2        A.    Yes.

3        Q.    All right.  Now, the forklift that you're

4    operating is a substantial piece of equipment, right?

5        A.    Yes, it is.

6        Q.    It's a heavy vehicle?

7        A.    Yes, it is.

8        Q.    You hit someone or something with it, you

9    have the potential to seriously injure yourself or the

10   person being struck, right?

11       A.    That is correct.

12       Q.    You could even kill someone if you hit

13   them with a forklift?

14       A.    Oh, that is correct.

15       Q.    And would you agree that it's important

16   for Whirlpool to ensure that you're able to drive a

17   forklift in a safe manner so as not to potentially

18   injure yourself or someone else?

19       A.    I would agree.

20       Q.    Okay.  So you know as of April of 2003

21   that you have this heart problem, but it's not

22   diagnosed until November of 2007, right?

23       A.    That's correct.

24                     (Court Reporter marked

25                     Defendant's Exhibit 4.)

12412258-b285-41c0-91c9-798eb95cf0a6

1       Q.    And did you have an understanding as to

2  what "intermittent leave" meant?

3       A.    Not to -- I understood it to be if I was

4  feeling bad, then I could be -- I could leave work

5  without it going on my work record.  I would not be

6  paid for the time I was off if I left during the day,

7  but it would not be held against me.

8       Q.    Okay.  In other words, though, you were

9  not seeking leave for a block of days or time, right?

10      A.    That's correct.

11      Q.    You were seeking leave in the case where

12  you had an attack, or a spasm, and had to leave work

13  early, or not go to work at all on a given day?

14      A.    That's correct.

15      Q.    Okay.  And that request was approved?

16      A.    Yes.

17      Q.    And, in fact, since April of 2003, you've

18  applied for FMLA leave in relation to your condition,

19  I counted, a total of six times, if you include

20  Exhibit 6; isn't that right?

21      A.    Yes.  Because they would only allow me to

22  have it for a certain period of time, and I had to

23  renew --

24      Q.    Right.

25      A.    -- it after a certain period of time.

1    Q.    It was approved on six-month increments,

2    right?

3    A.    That's correct.

4    Q.    Okay.  So if we just make sure we have

5    all the applications.

6                    (Court Reporter marked

7                    Defendant's Exhibit 7.)

8    BY MR. WIT:

9    Q.    So if we look at Exhibit 7, this is your

10   application for family and medical leave for May of

11   2007, right?

12   A.    That is correct.

13   Q.    And this was approved for the period of

14   time between May 4 and November 4, 2007?

15   A.    That is correct.

16   Q.    And then if we look at Exhibit 8.

17                   (Court Reporter marked

18                   Defendant's Exhibit 8.)

19   BY MR. WIT:

20   Q.    Do you have that in front of you?

21   A.    Yes, I do.

22   Q.    This is your application for family and

23   medical leave in November of 2007?

24   A.    That is correct.

25   Q.    And this leave was approved through May

12412258-b285-41c0-91c9-798eb95cf0a6

1    2008?

2          A.    Oh, okay, yes.  I didn't see that black

3    box there.

4          Q.    You recall it being approved for a

5    six-month period of time?

6          A.    That's correct, yes.

7          Q.    Okay.  And then Exhibit 9?

8                      (Court Reporter marked

9                      Defendant's Exhibit 9.)

10   BY MR. WIT:

11         Q.    This is your application -- could I see

12   the one you're looking at?  I'm one ahead of you.

13               Exhibit 9 is the application for family

14   and medical leave that you submitted in May of '08,

15   right?

16         A.    That's correct.

17         Q.    Which was approved through November of

18   '08?

19         A.    That's correct.

20                      (Court Reporter marked

21                      Defendant's Exhibit 10.)

22   BY MR. WIT:

23         Q.    And then Exhibit 10, this is your

24   application in late October of 2008, which would have

25   been approved through May of 2009, right?

12412258-b285-41c0-91c9-798eb95cf0a6

1      A.    Correct.

2      Q.    So each one of these applications -- so

3   actually I count a total of -- oh.

4            You also applied for family and medical

5   leave with respect to this condition in 2004; isn't

6   that right?

7      A.    That, unless I seen the paperwork, I

8   can't be a hundred percent sure.

9                  MR. WIT:  Can we go off for a

10                 minute?

11                 THE VIDEOGRAPHER:  The time now

12                 is 11:06 a.m.  Going off the record.

13                 (Discussion had off the record.)

14                 THE VIDEOGRAPHER:  The time now

15                 is 11:07 a.m. going back on the record.

16                 (Court Reporter marked

17                 Defendant's Exhibit 11.)

18   BY MR. WIT:

19     Q.    And, actually, Mr. Wurzel, I think I

20   misspoke.  It appears that you applied for FMLA

21   intermittent leave in July of '04 in relation to your

22   kidney stones?

23     A.    According to this, yes, I have.

24     Q.    And that was approved, as well, was it

25   not?

12412258-b285-41c0-91c9-798eb95cf0a6

1   a degree that he says, at least, that he contacts

2   Dr. Roush?

3          A.     Yes.  I think he was filling in for

4   Dr. Issa at that time.

5          Q.     They work in the same group?

6          A.     Yes.

7          Q.     Okay.  Is that a legitimate concern, in

8   your opinion, for Dr. Marshall to have, that you are

9   able to safely perform your role as a forklift

10  operator, given the nature of your condition?

11         A.     Oh, yes.

12         Q.     Had you ever seen Dr. Marshall before

13  November 8, 2007?  In any capacity, I mean.  Not just

14  going to see him at the health center?

15         A.     Not to the best of my recollection, no.

16         Q.     So this was the first meeting you had had

17  with him?

18         A.     Yes.

19         Q.     Do you know what kind of doctor he is?

20         A.     No, I don't.

21         Q.     Do you know where else he practices, if

22  anywhere?

23         A.     As far as I understood, he worked at

24  Memorial Hospital.

25         Q.     Do you know if he was an actual employee

12412258-b285-41c0-91c9-798eb95cf0a6

Page 98

1    of Whirlpool?

2         A.    I know he was employed through Whirlpool

3    as their company doctor, and that's all I know.

4         Q.    All right.  You don't know the

5    relationship between Whirlpool and Dr. Marshall, other

6    than to say he worked in the health center sometimes?

7         A.    That's correct.

8         Q.    All right.  And what's -- what was your

9    understanding -- did you have any understanding as to

10   what he did for Whirlpool?

11        A.    As far as I knew, cleared people to come

12   back to work.

13        Q.    That's the only reason why you saw him,

14   right?

15        A.    That's correct.

16        Q.    All right.  Why don't we look back to

17   Exhibit 12, and there is an entry for March 11, 2008,

18   on the bottom of the second page.

19              Do you see where I'm looking?

20        A.    Yes.

21        Q.    And I'm reading -- and I'm quoting here:

22   It says, 0625, reports to H.C. because not feeling

23   good.  Requests BP check, 158/98.  States hasn't felt

24   well for the past couple days.  Has issues with heart.

25   Also is a jeep driver.  Strongly advised could not

12412258-b285-41c0-91c9-798eb95cf0a6

1    drive jeep in his condition.   Claims, "I know, I

2    haven't taken any nitro yet.   Trying to fight it."

3    Employee called wife, going home FMLA.

4                 Did I read that correctly?

5          A.    Yes, that's the way it looks here.

6          Q.    Okay.   Does that accurately describe what

7    happened when you visited the health center on March

8    11, 2008?

9          A.    To the best of my recollection, yeah.   I

10   felt that I could not safely perform my job and I

11   shouldn't be driving, so I went home.

12         Q.    What was it about the way you were

13   feeling that led you to the conclusion that you

14   couldn't safely perform as a forklift operator?

15         A.    Fatigued, just -- it says I was trying

16   not to take a nitro, fighting it, but I think I ended

17   up taking one.

18         Q.    Okay.

19         A.    And it just left me feeling fatigued, and

20   I felt that I was -- shouldn't be, you know, driving a

21   forklift due to my safety and the safety of others.

22   So I went home for the day.

23         Q.    And it indicates here that you hadn't

24   been feeling good for the past couple days at that

25   point, right?   So you'd had attacks on successive days

12412258-b285-41c0-91c9-798eb95cf0a6

1    A.    Yeah.  I can't say one way or another if

2  he has or not.

3    Q.    All right.  And what I've handed you,

4  Exhibit 14, is the report of your examination with

5  Dr. Marshall on March 13th, 2008, right?

6    A.    That's correct.

7    Q.    And is this a full and accurate

8  description of what you said to Dr. Marshall and what

9  he said to you during that visit?

10    A.    It could very well be, yes.

11    Q.    Well, read it.

12    A.    Yeah, I've read it.  I'm not --

13    Q.    Okay.

14    A.    Because, you know, I'm not too clear on,

15  you know, some things, I'm not going to argue that

16  it's not or --

17    Q.    All right.  So to the best of your

18  recollection, as you sit here today, this is a full

19  and accurate description of what happened during your

20  March 13, 2008, visit with Dr. Marshall?

21    A.    Yes.

22    Q.    All right.  And according to

23  Dr. Marshall, because you had back-to-back episodes or

24  spasms, he wants you to consult with your cardiologist

25  before you return to work, right?

1        A.    That's correct.

2        Q.    Do you think that that was a reasonable

3 concern for Dr. Marshall to have?

4        A.    Oh, yeah.  I didn't argue the point, no.

5        Q.    Okay.  And Dr. Marshall indicates that

6 his main concern here is that you might be suddenly

7 incapacitated per a spasm and put yourself or others

8 at risk?

9        A.    That's correct.

10        Q.    And that's a legitimate concern to have,

11 right?

12        A.    Yes.

13        Q.    In fact, you had the same concern at the

14 time you had the attack, that's why you went home,

15 right?

16        A.    Right.  Because I felt that -- not that I

17 was going to pass out or anything, but I just knew I

18 wasn't physically feeling okay to perform my job.

19        Q.    So would it be reasonable for

20 Dr. Marshall to take steps to ensure that you can

21 perform the job safely in terms of not harming

22 yourself or others?

23        A.    Yes.

24        Q.    And you saw Dr. Issa that -- that same

25 day, right?

12412258-b285-41c0-91c9-798eb95cf0a6

1       A.     I'm pretty sure --

2       Q.     Let me see if I can refresh your

3 recollection.

4       A.     Yeah, according to my records, I saw

5 Dr. Issa on the same day, yes.

6                (Court Reporter marked

7                Defendant's Exhibit 15.)

8 BY MR. WIT:

9       Q.     Showing you what I marked as Exhibit 15,

10 this is a record of a visit I believe you had with

11 Dr. Issa on March 13th, 2008.  Review that and make

12 sure I'm correct in that regard.

13       A.     Yes.  This looks like my visit to him,

14 yes, it does.

15       Q.     Okay.  And in this record, if you look

16 at -- on the first page, there is a section that's

17 labeled History of Present Illness.

18       A.     Right.

19       Q.     It indicates that Dr. Issa reports you

20 told him that you had experienced rare episodes of

21 chest tightness relieved with nitroglycerin, and that

22 you denied any cardiac symptoms; is that right?

23       A.     Right.

24       Q.     Did you tell Dr. Issa that you had an

25 attack severe enough such that you thought you

1   A.  No.

2   Q.  That's accurate?

3   A.  That's correct.

4   Q.  And what were your job responsibilities

5 as -- but you -- strike that.

6     You did the gatekeeper position, when you

7 had it, on a regular, full-time, daily basis?

8   A.  That's correct.

9   Q.  And what were your job responsibilities

10 as a gatekeeper?

11   A.  When parts were being moved from the

12 warehouse to the assembly lines, I scanned the parts

13 out and assigned them to what locations they were

14 going to.

15     So from what my understanding is, each

16 line was billed for parts they used, and this was to

17 keep track of what parts were going where in the

18 factory.

19   Q.  And did you work at a desk?

20   A.  Yes.

21   Q.  The entire time?

22   A.  Yes.

23   Q.  And did you work alone?

24   A.  Yes.

25   Q.  Were there periods of time when you were

12412258-b285-41c0-91c9-798eb95cf0a6

1   BY MR. WIT:

2          Q.    Okay.  Back from lunch, Mr. Wurzel.

3   You're still under oath, you know?

4          A.    Yes.

5          Q.    Okay.  So you're placed into this

6   gatekeeper position as of March 17th, 2008, right?

7          A.    That's correct.

8          Q.    And you're told that it's going to be

9   temporary?

10         A.    That's correct.

11         Q.    And that ultimately you'll have to bid

12  back out into a permanent position?

13         A.    That's correct.

14         Q.    All right.  Now, did you believe that you

15  were being treated unfairly in some way in being

16  placed in the gatekeeper position?

17         A.    I did, yes.

18         Q.    How so?

19         A.    Seeing as how I have a medical condition,

20  and I know other drivers that have medical conditions,

21  but yet they're still okay to drive.

22         Q.    Well, which drivers are you referring to

23  specifically?

24         A.    Well, I'd prefer not to mention any

25  names.

12412258-b285-41c0-91c9-798eb95cf0a6

1      A.    No, I don't.

2      Q.    So you're not really saying here that you

3  needed some form of accommodation to perform your job,

4  right?

5      A.    No, I was capable of performing my

6  duties.  I performed them to a hundred percent in

7  100-degree heat.

8      Q.    Right.  So you're saying Whirlpool should

9  have let you continue at your job as a forklift

10  operator in March of 2008 without any restriction or

11  need for accommodation?

12      A.    I think, in my opinion, that if I would

13  have had incidents of being unsafe or jeopardizing

14  people's lives, then, yes, I think they would have

15  been substantiated, I'm not sure if that's the word,

16  in their decision.

17      But I know people that are healthy

18  drivers that hit people.  So --

19      Q.    But because you hadn't had any safety

20  incidents in the past, you felt that you should have

21  been allowed to continue as a forklift operator?

22      A.    I think I should have, yes, in my

23  opinion, yes.

24      Q.    And in your opinion, you didn't need any

25  type of accommodation in order to continue in that

1    document (indicating).

2         A.    I'm just trying to remember which order I

3    got these in.  Okay.  I have the exhibit.

4         Q.    Okay.  If you'll turn to the third page,

5    you'll see two entries in June, one on the 10th and

6    one on the 17th?

7         A.    Okay.  Yes, I see that.

8         Q.    Okay.  Now, I want to focus for a

9    moment -- so this would indicate, at least, that you

10   at least had two episodes in June of 2008, right, two

11   spasms?

12        A.    Yes.  According to these records, yes.

13        Q.    It may have been more than that, but the

14   other ones you may just not have gone to the health

15   center?

16        A.    That's correct.

17        Q.    Okay.  Now, with respect to the spasm

18   that brought you to the health center on June 10th,

19   the entry indicates that Bill Hartwig took you to the

20   health center on that occasion?

21        A.    Yes, yes.

22        Q.    And is that accurate?

23        A.    Yes.  Because I called him over to my

24   jeep, because I felt bad.

25        Q.    To your jeep?

12412258-b285-41c0-91c9-798eb95cf0a6

Page 154

1     A.    Oh, no.  This is when I was the

2  gatekeeper.  I must have called him down to the desk,

3  indicating that I felt bad and I wanted to go to the

4  health center.

5     Q.    Did you need assistance to get to the

6  health center?

7     A.    I didn't feel real good.  I just had him

8  take me down on a cart instead of walking.  It wasn't

9  a very far distance, but instead of walking down, I

10  just had him take me down in a cart.

11     Q.    Well, what was your concern about walking

12  or going by yourself?

13     A.    I might have been lightheaded to the

14  point to where I felt better having somebody with me.

15     Q.    So was your concern, at least, in part,

16  that you might injure yourself on -- if you were to go

17  by yourself to the health center?

18     A.    I don't know if injured myself, or if it

19  might have been a bad enough one where, you know, it

20  had me worried, you know, about just how I felt.

21     Q.    And potentially losing consciousness on

22  the way to the health center?

23     A.    No.  Just I was feeling very lightheaded

24  and tired, but I wasn't to the point where I was

25  falling over or anything.

12412258-b285-41c0-91c9-798eb95cf0a6

1    Q.    But you were to the point where you felt

2  you needed someone to actually take you to the health

3  center?

4    A.    Oh, yes.

5    Q.    Okay.  And then you indicate -- and it

6  indicates here, States he just had his fifth episode

7  of angina in the last four days.  He had just taken a

8  nitro tablet and was starting to feel better.  BP 138/

9  80.

10         Does that accurately reflect what

11  happened when you got to the health center?

12    A.    Uh-huh, yes.

13    Q.    Okay.  And you're -- and this one is a

14  severe attack, would that be fair to say?

15    A.    Well, I was stating that I was feeling

16  better.  I think I just wanted to have my blood

17  pressure and everything checked to see if I was

18  stabilizing and coming down, if the pills had worked.

19    Q.    All right.  And the last sentence says,

20  Appears very fatigued and voiced that he wanted to go

21  home.

22    A.    So it must have knocked the wind out of

23  me, or taken the wind out of me to where --

24    Q.    Is that accurate?

25    A.    Yes.

1   Q.   All right.  So you went home as a result
2   of this attack?
3   A.   Yes.
4   Q.   And then the nurse with whom you spoke
5   was Ms. Yontz, right?
6   A.   Yes.
7   Q.   Okay.  Then you have another attack or
8   spasm on the 17th, a week later, that causes you to go
9   to the health center and go home?
10   A.   Yeah, according to this.
11   Q.   Do you have any reason to doubt that?
12   A.   Oh, no, no.  I'm not questioning that.
13   Q.   All right.  And, actually, after the
14   spasm on the 17th, you went to Dr. Issa, didn't you?
15   It's not on here.
16   A.   I couldn't say with all certainty.
17   Q.   Okay.  Well, let's show you this.
18   A.   If it's in his report, then --
19                    (Court Reporter marked
20                    Defendant's Exhibit 18.)
21   BY MR. WIT:
22   Q.   This is 18, which I will tell you is a
23   record we received from Dr. Issa with respect to a
24   visit you had with him on June 17th, 2008.
25   A.   Okay.

12412258-b285-41c0-91c9-798eb95cf0a6

Page 182

1   for you having had attacks.  Do you see where we are

2   looking?

3          A.    Yes, I see.

4          Q.    All right.  So on 9-5, the indication is

5   that this one -- the spasm was really bad.  That's how

6   you describe it, right?

7          A.    Right.

8          Q.    And that you took a nitro?

9          A.    Refused O2, because it didn't really

10  help.

11         Q.    Right.  So you went home?

12         A.    Right.

13         Q.    Does this entry on 9-5-08 accurately

14  describe what actually happened when you were at the

15  health center?

16         A.    Yeah.  Because I know oxygen don't --

17         Q.    -- doesn't help?

18         A.    No.  Because once I get everything

19  flowing, I'm pretty much breathing on my own and

20  everything.

21         Q.    All right.  And then you have another bad

22  spasm on September 26th, 2008, that causes you to go

23  to the health center?

24         A.    Yes.

25         Q.    And the notation here is that you were

12412258-b285-41c0-91c9-798eb95cf0a6

1  brought to the HC by your supervisor after taking

2  three nitro tablets; BP 168/96; states he was dizzy

3  and fatigued.  Employee wanted to go home and did so.

4          Is that accurate?

5      A.    As far as the third nitro, I'm not a

6  hundred percent on.  But as far as the rest of it,

7  yes.

8      Q.    Okay.  You're not sure one way or another

9  whether you took three nitro tablets on that occasion?

10     A.    I know when I'm on my third nitro, I'm

11  usually calling EMS.  I'm not -- well, I'm going to

12  the health center, but I'm having them call EMS,

13  because if I'm on my third one --

14     Q.    Well, are you saying that this notation

15  is incorrect or you don't know one way or the other?

16     A.    I'm saying I don't know one way or other.

17     Q.    Okay.  So you go home on September 26th,

18  right?

19     A.    Right.

20     Q.    And you're saying that after you go home,

21  you're called at home by whom?  Your log says

22  Barb Dewey called.

23     A.    Okay.  Then that's who called me.

24     Q.    All right.  When did she call you, that

25  same day or --

12412258-b285-41c0-91c9-798eb95cf0a6

Page 184

1    A.    Yes.  It must have been.  Because that

2  was on the 26th.  If I'm not mistaken, that was a

3  Friday.

4    Q.    September 26th?

5    A.    Why it sticks out in my head, I couldn't

6  really tell you, but --

7    Q.    And describe your conversation with

8  Ms. Dewey.

9    A.    She just told me that, once again, I

10  couldn't come back to work until I was cleared through

11  the company doctor, and that my successful bid was

12  being taken away from me due to me not being able to

13  come back to work until I seen the company doctor.

14    Q.    Did you know -- did she explain to you

15  why that was the case, why the bid was being taken

16  away?

17    A.    Because I had to be cleared through the

18  company doctor until I could come back to work so --

19    Q.    And the job started on a particular day?

20    A.    Right, as far as I know.

21    Q.    So because you weren't able to start the

22  job on a particular day --

23    A.    The job was taken away from me.

24    Q.    Okay.  And Barb, at least, told you that

25  you had to see Dr. Marshall before you could return to

12412258-b285-41c0-91c9-798eb95cf0a6

Page 185

1    work?

2         A.    That's correct.

3         Q.    And do you know what the basis for that

4    decision was, why they wanted -- why Ms. Dewey was

5    telling you had to do this?

6         A.    I have no idea why.

7         Q.    Okay.

8         A.    I couldn't speculate.

9         Q.    Did you think it was unfair?

10        A.    Once again, yes, because I just went home

11   on FMLA.  I wasn't off for a prolonged period of time.

12   I just went home that day.

13        Q.    Now, you saw Dr. Marshall shortly

14   thereafter, right, on October 2nd, 2008?

15        A.    Yep.  Well, yes.  According to my

16   records, and I knew I had set an appointment with my

17   cardiologist also.

18                        MR. WIT:  Okay.  21, lucky 21.

19                        (Court Reporter Marked

20                        Defendant's Exhibit 21.)

21   BY MR. WIT:

22        Q.    All right.  Exhibit 21 is a report with

23   respect to an examination between you and Dr. Marshall

24   on October 2, 2008.

25                        Read the Subjective and Objective and

12412258-b285-41c0-91c9-798eb95cf0a6

1    tell me if this is an accurate description of what

2    happened during your visit with Dr. Marshall.

3         A.    To the best of my knowledge, this is.

4    The three nitros, again, I take into question, but I

5    could be mistaken on it.

6         Q.    Uh-huh.  But outside of your -- outside

7    of whether or not you're sure about that, this is --

8    Dr. Marshall accurately describes what you and he

9    discussed?

10        A.    To the best of my knowledge, yes.

11        Q.    Okay.  And, again, he also expresses his

12   concern -- expresses that he continues to be concerned

13   as to whether you can drive a towmotor or work in

14   safety-sensitive areas, right?

15        A.    That's correct.

16        Q.    And so he recommends that you remain out

17   of work at this point?

18        A.    Yes.  Until I see my doctor -- or my

19   cardiologist.

20        Q.    Okay.  Did he also ask you if he could

21   speak with your cardiologist?

22        A.    Yes.  I remember signing a paper giving

23   him permission to speak with Dr. Issa.

24        Q.    Obviously, he wants to gain a better

25   understanding, himself, as to your condition and how

12412258-b285-41c0-91c9-798eb95cf0a6

1    Q.    Look under the last heading, Plan.

2    A.    Oh, oh, sorry.  I was just reading the

3  Subjective.

4    Q.    Oh, okay.

5    A.    Yeah.  That's the plan that they had set

6  up back in March.

7    Q.    Right, right.  This is nothing new to

8  you, right?  You had been told that before.

9    A.    Right.  This is a continuation, yes.

10    Q.    Now, at this point, October 7th, do you

11  have a job to go back to yet?

12    A.    No.

13    Q.    No.  All right.  What happened with

14  respect to that issue?

15    A.    If I may refer to my notes, I know on

16  10-8, Carol Wasserman called me.

17    Q.    So, 10-8, Ms. Wasserman calls you?

18    A.    To inform me there is three options I

19  had:  A job bid on round ware on afternoons; a job in

20  the paint department on afternoons, that I had enough

21  time to secure; and if I didn't take any one of those

22  two options, that my third option was to take layoff.

23    Q.    So the two options, she said, the job in

24  round ware?

25    A.    That's correct.

12412258-b285-41c0-91c9-798eb95cf0a6

1    or do you think anything needs to be taken out of it?

2         A.    I see here on the work environment, There

3    were eight rotations noted along the line.

4              I'm not sure what they mean by

5    "rotations," whether that's where the conveyor turns,

6    because we consider rotations, like I'm sitting in

7    this chair, every half hour we move around.  So I'm

8    not sure what they mean by rotations there.

9         Q.    Okay.  So you're unable to express an

10   opinion one way or another on --

11        A.    Right, because I know there wasn't eight

12   jobs up there for us to rotate between.

13        Q.    Okay.

14        A.    As far as turns in the line, that could

15   be.  But like I said, I'm not sure.

16        Q.    As far as you read Exhibit 20, though,

17   this accurately describes the position that you went

18   to in paint?

19        A.    Yes.

20        Q.    Do you know that this Exhibit 20, that

21   this job analysis, job site review, was conducted for

22   the purpose of you assuming this position?

23        A.    I'm not sure I follow.

24        Q.    All right.  Do you know whether or not a

25   job site review, as is reflected in Exhibit 20, was

12412258-b285-41c0-91c9-798eb95cf0a6

1            MR. WIT:  Okay.  Exhibit 26.

2            (Court Reporter marked

3            Defendant's Exhibit 26.)

4  BY MR. WIT:

5            Q.    Exhibit 26, that's the letter you

6  received?

7            A.    Yes, it is.

8            Q.    Do you understand who ordered the

9  independent medical exam?

10           A.    As far as my understanding, it was -- I

11  don't know if it was Dr. Marshall, or who at work, but

12  it was somebody at work who relayed the order.

13           Q.    Do you know why it was ordered?

14           A.    Not really.

15           Q.    And you had the IME on November 4th -- or

16  you had the IME on November 13, 2008; is that right?

17           A.    Yes.

18           Q.    And the IME was with Dr. Haridas Biswas,

19  right?

20           A.    That's correct.

21           Q.    Were you familiar with Dr. Biswas?

22           A.    No, I had never seen him before in my

23  life.

24           Q.    So that was the first time you'd seen

25  him?

1    what happened?

2          A.    No, because I don't know who

3    Dr. Stockmaster is.  It must be a misprint because --

4          Q.    Could it be Dr. Stockton?

5          A.    He's the one that did my catheter.  He

6    told the nurse here earlier that he was taking up to

7    nine at a time.  That would kill me.

8          Q.    Well, she indicates here that you told

9    her that you can take up to 25 nitroglycerin in a day;

10   and you told her that you had told the nurse earlier

11   that you were taking up to nine at a time.

12          Are you saying -- did you tell Ms. Horne

13   that?

14          A.    I remember talking with Dr. Issa about

15   taking nitroglycerin, if that would affect my heart,

16   he told me I could take up to 25 a day if I needed.

17          Q.    Okay.

18          A.    And this nine at a time, I know if I had

19   to take that many, that would kill me.

20          Q.    So you're saying you didn't say that to

21   Ms. Horne?

22          A.    No.  I would never take nine.  Because I

23   know after three, I better be calling EMS, because I'm

24   having serious problems.

25          Q.    But you told her that you could take up

1  to 25 nitros in a day?

2      A.    I told her that I talked to my physician,

3  Dr. Issa, and he told me I could take up to 25 a day

4  with no ill effects to my heart or --

5      Q.    Did you return to work after meeting with

6  Ms. Horne?

7      A.    I have not.

8      Q.    You haven't returned to work since?

9      A.    I haven't returned to work since 2-5-09.

10  I haven't worked in almost eight months now.

11      Q.    Did you meet with Dr. Horne again after

12  meeting with -- I'm sorry, Dr. Marshall?

13      A.    I've met with Dr. Marshall; I've seen Dr.

14  Issa; I've met with Mark; I've met with Barb Dewey.

15  I've met with anybody I can think to meet with, and

16  they will not let me come back.

17      Q.    Well, did you speak with Ms. Dewey after

18  meeting with Ms. Horne?

19      A.    I can't remember if I did or not, to be

20  honest.

21      Q.    Well, you're -- okay.  There is a

22  notation in your incident log on the 10th that you

23  asked Barb Dewey, How getting paid.

24      A.    Right.

25      Q.    So did you have a conversation with her?

1    A.    That's correct.

2    Q.    Do you know how long they remain in

3 effect before it rolls off?

4    A.    It's -- if I'm not mistaken, it's -- like

5 this one that says 4-9-08 --

6    Q.    Yeah.

7    A.    -- it would roll off on 4-9-09.

8    Q.    Okay.

9    A.    So it has to --

10    Q.    It's gone now?

11    A.    -- be a year after.  Yes, that's correct.

12    Q.    Okay.  And you received no subsequent

13 discipline for attendance violations, is that right,

14 after this one?

15    A.    Oh, no, because I wasn't working no more.

16    Q.    Did you lose any pay or benefits or

17 seniority or anything else as a result of this

18 discipline?

19    A.    No.

20    Q.    Do you believe that you've been

21 retaliated against in any way for using family and

22 medical leave?

23    A.    No.

24    Q.    Now, there's also a claim in your

25 complaint that you've been subjected to the

1      Q.    Or anyone else at Whirlpool?  Do you

2  think anybody at Whirlpool made the decisions they

3  made with respect to your employment with the intent

4  of causing you any harm?

5      A.    That I cannot answer.  I don't know.

6      Q.    Do you have any knowledge of anyone

7  having any type of past criminal or tortious or

8  dangerous type conduct or background, of the managers

9  who you've dealt with or the doctors who you've dealt

10  with at Whirlpool?

11      A.    I hope they don't have criminal

12  backgrounds.  I don't know.

13      Q.    So you don't know?

14      A.    Not to my knowledge.  No, I don't know.

15  I'm at a loss for why this is going on.  I just don't

16  understand.

17      Q.    A couple of questions, Mr. Wurzel, about

18  your responses to the company's written

19  interrogatories.

20            We're almost finished.  Do you need a

21  break, or are you doing okay?

22      A.    No.  It's not like I got to go to work.

23                 (Court Reporter marked

24                 Defendant's Exhibit 38.)

25  BY MR. WIT: