# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**BRIAN WURZEL,**

        Plaintiff,

        v.

**WHIRLPOOL CORPORATION,**

        Defendant.

:
:
:
:
:
:
:
:
:
:
:
:

Case No. 3:09 cv 498

Judge James G. Carr

Magistrate Judge Vernelius K. Armstrong

## DEFENDANT WHIRLPOOL CORPORATION'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**PAGE**

I.    STATEMENT OF THE ISSUES/SUMMARY OF THE ARGUMENT ......................... 1

II.    STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................. 2

    A.    Work Environment At the Clyde Division And Plaintiff's Employment.............. 2

    B.    Plaintiff's Medical Condition ................................................................................. 3

    C.    Dr. Marshall Consults With Plaintiff About His Medical Condition ................... 4

    D.    Dr. Marshall Restricts Plaintiff From Driving Tow Motors Or Company
            Vehicles.................................................................................................................... 5

    E.    Plaintiff Experiences Several Spasms At Work That Leave Him Fatigued,
            Dizzy, And/Or Lightheaded.................................................................................... 6

    F.    Plaintiff Has A Return To Work Evaluation With Dr. Marshall ........................... 7

    G.    Plaintiff Successfully Bids For A Multi-Process Team Member Position In
            The Paint Department ............................................................................................ 8

    H.    Plaintiff Experiences More Angina Spasms At Work ........................................... 8

    I.    Dr. Marshall Sends Plaintiff For An Independent Medical Examination.............. 9

    J.    Plaintiff Experiences Additional Angina Spasms At Work................................... 9

    K.    Dr. Marshall Contacts Dr. Biswas Regarding Plaintiff's Angina Spasms........... 11

    L.    Whirlpool Meets With Plaintiff Regarding His Restrictions And Position......... 12

III.    ARGUMENT ....................................................................................................... 13

    A.    Standard of Review............................................................................................... 13

    B.    Plaintiff's Claims Under The ADA And Ohio Disability Law Fail As A
            Matter Of Law...................................................................................................... 14

          1.    Plaintiff Has No Direct Evidence Of Discrimination ............................... 14

          2.    Plaintiff Cannot Establish A Prima Facie Case Of Disability
              Discrimination.................................................................................... 14

## TABLE OF CONTENTS
### (CONTINUED)

PAGE

    a.    Wurzel Cannot Establish He Is Disabled Under The ADA Or The ADAAA........................................................................... 15

        (1)    Pre-ADAAA "Regarded As" Claim ................................ 16

        (2)    Post-ADAAA "Regarded As" Claim............................... 17

    b.    Plaintiff Is Not A Qualified Individual With A Disability Because He Poses A Direct Threat To His Safety And The Safety Of Others ......................................................................... 18

        (1)    Duration Of The Risk........................................................ 18

        (2)    Nature and Severity of the Potential Harm ...................... 19

        (3)    Likelihood That The Potential Harm Will Occur ............ 19

        (4)    Imminence of the Potential Harm ..................................... 20

    c.    Whirlpool Did Not Take Any Unlawful Actions Against Plaintiff Solely Because Of His Angina ...................................... 21

    3.    Whirlpool Was Under No Duty To Accommodate Plaintiff.................. 23

C.    Plaintiff's FMLA Claims Fail As A Matter Of Law............................................ 24

    1.    Plaintiff Cannot Establish Whirlpool Interfered With His FMLA Rights When It Placed Him On Sick Leave.............................................. 24

    2.    Plaintiff Cannot Establish A Retaliation Claim Under The FMLA......... 26

D.    Plaintiff Cannot Establish An Intentional Infliction Of Emotional Distress Claim................................................................................................... 28

E.    Plaintiff Cannot Establish A Negligent Hiring, Supervision, or Retention Claim................................................................................................... 29

IV.    CONCLUSION................................................................................................. 30

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 247 (1986) ..................................................................................... 14

*Anthony v. United Tel. Co. of Ohio,*
    277 F. Supp. 2d 763, 770 (N.D. Ohio 2002) .................................................... 14

*Borgialli v. Thunder Basin Coal Co.,*
    235 F.3d 1284, 1294-95 (10th Cir. 2000) ........................................................ 19

*Brohm v. J. H. Properties, Inc.,*
    149 F.3d 517, 521 (6th Cir. 1998) ................................................................... 22

*Byrd v. Faber,*
    565 N.E.2d 584, 590 (Ohio 1991) .................................................................... 30

*Celotex Corp. v. Catrett,*
    477 U.S. 317, 327 (1986) ................................................................................. 13

*City of Columbus Serv. Comm'n v. McGlone,* 697 N.E.2d 204, 206-07 (Ohio
    1998) ................................................................................................................ 14

*Conner-Clement v. Trinity Indus., Inc.,*
    No. 3:07cv1154, 2009 U.S. Dist. LEXIS 6125, at *19 (M.D. Tenn. Jan. 28,
    2009) ................................................................................................................ 27

*Davis v. Mich. Agric. Commodities, Inc.,*
    No. 08-10077, 2009 U.S. Dist. LEXIS 5582,
    at *23 (E.D. Mich. Jan. 12, 2009) ....................................................... 16, 17, 21

*Dawson v. Airtouch Cellular,*
    42 F. Supp. 2d 767, 773 (S.D. Ohio 1999) ..................................................... 30

*Dobrowski v. Jay Dee Contractors, Inc.,*
    No. 07-13267, 2008 U.S. Dist. LEXIS 43701, at *19 (E.D. Mich. June 3,
    2008) .......................................................................................................... 27, 28

*EEOC v. Kinney Shoe Corp.,*
    917 F. Supp. 419, 429 (W.D. Va. 1996) ............................................. 21, 22, 23

*Garner v. Gwinnett County, Georgia,*
    No. 96-3431, 1999 U.S. Dist. LEXIS 6370,
    at *10-11 (N.D. Ga. Mar. 20, 1999) ................................................................ 20

*Godfredson v. Hess & Clark, Inc.,*
    173 F.3d 365, 376 (6th Cir. 1999) ................................................................... 29

*Hanly v. Riverside Methodist Hosp.,*
    603 N.E.2d 1126, 1132 (Ohio Ct. App. 1991) ................................................ 28

*Harvender v. Norton Co.,*
    No. 96 cv 653, 1997 U.S. Dist. LEXIS 21467, at *23 (N.D.N.Y 1997) .............. 24, 25

*Hout v. City of Mansfield, Ohio,*

**TABLE OF AUTHORITIES**
(CONTINUED)

550 F. Supp. 2d 701, 745 (N.D. Ohio 2008) .................................................. 29, 30

*Hutton v. Elf Atochem N. Am., Inc.*,
273 F.3d 884, 894-95 (9th Cir. 2001) ..................................................... 19

*Linder v. Am. Nat'l Ins. Co.*,
798 N.E.2d 1190, 1197
(Ohio Ct. App. 2003) ......................................................................... 29

*Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir.
2001) ....................................................................................... 23

*McDonnell Douglas v. Green*,
411 U.S. 792, 802 (1973) .................................................................... 14

*Milholland v. Sumner County Bd. Of Educ.*, 569 F.3d 562, 565 (6th Cir. 2009) ................. 15, 16

*Morris v. Family Dollar Stores of Ohio, Inc.*, 320 F. App'x 330, 338 (6th Cir.
Mar. 31, 2009) ............................................................................. 27

*Moses v. Am. Nonwovens, Inc.*,
97 F.3d 446, 447-48 (11th Cir. 1996) ...................................................... 21

*Moss v. Formosa Plastics Corp.*,
99 F. Supp. 2d 737, 741 (M.D. La. 2000) .................................................. 24, 25

*Porter v. United States Alumoweld Co, Inc.*
125 F.3d 243, 245 (4th Cir. 1997) ........................................................ 25, 26

*St. Mary's Honor Ctr. v. Hicks*,
509 U.S. 502, 511 (1993) ................................................................... 15

*Sullivan v. River Valley Sch. Dist.*,
197 F.3d 804, 810 (6th Cir. 1999) ....................................................... 14, 16

*Washington v. Occidental Chem. Corp.*,
24 F. Supp 2d 713, 728 (S.D. Tex. 1998) .................................................. 21

*Watson v. City of Cleveland, et al.*,
202 F. App'x 844, 857 (6th Cir. Sept. 8, 2006) ........................................... 29

*Welling v. Weinfield*,
866 N.E.2d 1051 (Ohio 2007) ................................................................ 28

*Williams v. London Util. Com'n*,
375 F.3d 424, 428 (6th Cir. 2004) ........................................................ 15

*Workman v. Frito-Lay, Inc.*,
65 F.3d 460, 467 (6th Cir. 1999) .......................................................... 24

*Wysong v. The Dow Chem. Co.*, 503 F.3d 441, 449 (6th Cir. 2007) ........................... 24

*Yaeger v. Local Union 20*,
453 N.E.2d 666, 671 (1983) ................................................................. 28

## TABLE OF AUTHORITIES
### (CONTINUED)

PAGE

### STATUTES

42 U.S.C. § 12101 ........................................................................................... 1

42 U.S.C. § 12102(2) (A)-(C) ....................................................................... 16

42 U.S.C. § 12102(3)(A) (2009) ................................................................... 17

42 U.S.C. § 12112(d)(4) .......................................................................... 25, 26

Ohio Revised Code Section § 4112.02 ...................................................... 1, 14

### OTHER AUTHORITIES

2 EEOC Compliance Manual § 902:0185 (2000) ......................................... 25

### RULES

29 C.F.R. § 1630.14(c) ............................................................................ 25, 26

29 C.F.R. § 1630.2(j)(3)(i) ............................................................................ 16

29 C.F.R. § 825.113(a) ........................................................................... 24, 25

29 C.F.R. 1630.2(r) ...................................................................................... 18

# I.  STATEMENT OF THE ISSUES/SUMMARY OF THE ARGUMENT

Plaintiff, Brian Wurzel suffers from Prinzmetal angina, a condition which causes spasms in his coronary arteries.  The condition is "unstable," meaning that Plaintiff can have an attack at any point in time without warning.  Depending upon the severity, an attack causes Plaintiff to become dizzy, lightheaded, and fatigued.

Beginning in late 2007/early 2008, the frequency of Plaintiff's attacks worsened, and Whirlpool became increasingly concerned for Plaintiff's safety and the safety of those around him.  At the time, Plaintiff worked primarily as a tow motor driver on a factory floor with tow motors and pedestrians in close proximity to one another, and automated presses, drills and assembly lines at every turn.  One slip could cause serious injury or death to Plaintiff or one of his co-workers.  Thus, over the course of 2008 and 2009, in an effort to ensure that this would not happen, Whirlpool restricted Plaintiff from driving a tow motor and ultimately restricting him from working alone around moving machinery.

Plaintiff claims that Whirlpool's actions in this regard violated the Ohio Revised Code Section § 4112.02, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Family and Medical Leave Act ("FMLA"), and that the Company's conduct amounted to intentional infliction of emotional distress ("IIED") and negligent hiring, supervision, and retention.  In essence, Plaintiff complains that, because his personal physician indicated that he could return to work without restriction, Whirlpool should not have prevented him from operating a tow motor and ultimately placed him on sick leave when there was no job available that he could do safely.

The undisputed evidence shows, however, that Whirlpool has not violated Plaintiff's rights.  Since 2003, Whirlpool has approved Plaintiff's applications for FMLA leave in connection with his condition.  In the end, unfortunately, Plaintiff was not as forthcoming with

his physicians as he should have been. Based upon the objective, undisputed evidence, the Company was ultimately correct in determining that Plaintiff posed a direct threat to the safety of himself and others at Whirlpool, and thus, was not qualified for the positions he held. Therefore, Whirlpool's Motion for Summary Judgment should be granted.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.     Work Environment At the Clyde Division And Plaintiff's Employment

Whirlpool's Clyde Division is a manufacturing site with over 2500 employees and 6 operating assembly lines, all of which include moving machinery. Schulz Aff. ¶ 2. The site is replete with numerous moving company vehicles, including tow motors (forklifts), which weigh 10,000 pounds and are in continuous motion. *Id.* There is constant interface between employees who are walking through the site and the operating tow motors. *Id.* Tow motors and pedestrians use the same passageways, and there is no physical barrier between them. *Id.* Rather, tow motor lanes and pedestrian lanes are separated by painted lines. *Id.*

The machinery contained on site includes, but is not limited to, presses, drills, cutting machinery, and moving assembly lines, which carry large parts and products. *Id* at ¶ 3. All of the machines are automated and difficult to shut down. *Id.* Many of them move at a fast pace. *Id.* Due to the moving machinery and operating tow motors and forklifts, the noise level at the site is very high. *Id.* Accordingly, employees are required to wear earplugs at all times when walking through and working in the site. *Id.*

Plaintiff began his employment with Whirlpool at the Clyde Division in or around March of 1983. Pl. Dep. at 19-20. As of August 2003, Plaintiff was employed as Materials Handler. Schulz Aff. ¶ 5. Plaintiff's primary duty in this position was to drive a tow motor to transport boxes that contained product literature to and from a subassembly area. Pl. Dep. at 47. As a result, Plaintiff had to drive throughout the factory floor and had constant interface with

2

pedestrians and other operating tow motors. *Id.* at 48-50.

**B.     Plaintiff's Medical Condition**

Plaintiff first sought medical attention for chest pain on April 20, 2003. Pl. Dep. at 43. The next month, Plaintiff visited the Employee Health Center ("EHC") at the Clyde Division and told Dr. George Jabaly, the plant physician at the time, that he had almost lost consciousness twice because of chest pain and often felt weak and dizzy. *See* May 15, 2003 Patient Notes. Concerned for Plaintiff's safety given the plant work environment, Dr. Jabaly told Plaintiff he could not return to work until he saw his doctor. *Id.* Plaintiff applied and received approval for FMLA leave for the period of time he was absent – May 13, 2003 to May 22, 2003 – and was subsequently cleared to return to work without restrictions. *See* June 5, 2003 Patient Notes; Pl. Dep. Exhibit 6.

Plaintiff thereafter applied for intermittent FMLA leave for what his family physician, Dr. Hiestand, initially described as spasms of stable angina. Pl. Dep. at 76-77; Pl. Dep. Exhibit 7. Dr. Hiestand indicated that Plaintiff's condition would last a lifetime. *Id.* Thus, from that time until October 28, 2008, Plaintiff applied and was approved for intermittent FMLA leave every six months in relation to his chest pains, which is the maximum amount of time Whirlpool allows per application. Pl. Dep. Exhibits 6-10; Caudill Aff. ¶ 4-5. Pursuant to Whirlpool's policies, FMLA leave runs concurrently with sick leave. Caudill Aff. ¶ 7.

In November of 2007, Plaintiff was diagnosed with Prinzmetal angina. Pl. Dep. at 28. Prinzmetal angina causes spasms in the coronary arteries without warning. Issa Dep. at 9-10. According to Plaintiff's cardiologist, Dr. Mark Issa, there is no way to predict when or how often a spasm might occur or how severe it will be. *Id.* at 10; 65. When Plaintiff has an angina spasm, he experiences a range of symptoms, depending upon the severity of the attack, including tightness in his chest, shortness of breath, numbness in his left arm, pain in his neck, dizziness,

3

and fatigue. Pl. Dep. at 33-34.

Plaintiff takes Nitroglycerin ("Nitro") tablets when spasms occur in order to relieve the symptoms. Pl. Dep. at 29. There is no way to predict how many Nitro tablets Plaintiff may need to relieve the symptoms, although Plaintiff has been advised that if the symptoms are not relieved after three tablets within a fifteen minute period, he should go the emergency room. Issa Dep. at 76-77, 87. Nitro lowers an individual's blood pressure and, in and of itself, can cause headaches, hypotension, dizziness, and lightheadedness. *Id.* at 46-47; Biswas Dep. at 56.

**C.     Dr. Marshall Consults With Plaintiff About His Medical Condition**

On November 8, 2007, following his Prinzmetal angina diagnosis, Plaintiff met with Dr. Robert Marshall at the EHC for a return to work evaluation. Marshall Dep. at 19-20. For the past five years, Dr. Marshall has contracted with Whirlpool to act as the plant physician at the Clyde Division. *Id.* at 4-5. In that role, Dr. Marshall treats injured employees who visit the EHC and evaluates employees or prospective employees to confirm they can perform the jobs that they are being asked to do by Whirlpool. *Id.* at 5.

Plaintiff saw Dr. Marshall on November 8th because his condition posed potential safety concerns. Dewey Aff. ¶ 2. When a condition for which an employee goes on leave poses safety concerns, the employee must see the plant physician to ensure the employee can safely perform the essential functions of his or her job. *Id.*

Plaintiff informed Dr. Marshall that he had been diagnosed with Prinzmetal angina and that he took Nitro when necessary to relieve his symptoms. Marshall Dep. at 19-20. Dr. Roush, one of the physicians treating Plaintiff, had released Plaintiff to return to work without restriction. *See* Dewey Dep. Exhibit 40. Concerned for Plaintiff's safety, given the nature of his condition, Dr. Marshall contacted Dr. Roush to confirm that Dr. Roush understood Plaintiff's job duties so that there would be no confusion as to the safety-sensitive nature of Plaintiff's position.

4

Pl. Dep. Exhibit 13. Dr. Roush assured Dr. Marshall that Plaintiff was able to drive a tow motor without limitation, so Dr. Marshall returned Plaintiff to work without restrictions. *Id.*

### D. Dr. Marshall Restricts Plaintiff From Driving Tow Motors Or Company Vehicles

On March 11, 2008, Plaintiff visited the EHC and then went home after an angina spasm because he felt fatigued and was concerned that he would pose a safety risk if he drove a tow motor in his condition. Pl. Dep. at 98-99; Pl. Dep. Exhibit 12. On March 13, 2008, Plaintiff saw Dr. Marshall for a return to work evaluation. Pl. Dep. at 105-106; Pl. Dep. Exhibit 14. Plaintiff told Dr. Marshall that he had had two attacks back-to-back, but they had been resolved within a few minutes of taking Nitro. Pl. Dep. Exhibit 14. Concerned that Plaintiff was at risk for sudden incapacitation, Dr. Marshall asked Plaintiff to see Dr. Issa to confirm that Plaintiff was stable and able to return to work. *Id.*

Plaintiff saw Dr. Issa that same day but did not inform Dr. Issa that he had experienced back-to-back spasms, or that he had left work early due to fatigue and out of concern that it would not be safe for him to operate a tow motor. Pl. Dep. at 107; Issa Dep. at 50. Rather, Plaintiff told Dr. Issa that he rarely experienced angina spasms, and when he did, they were relieved promptly with Nitro. Pl. Dep. at 107. Moreover, Plaintiff never discussed with Dr. Issa the type of vehicle he drove or the type of machines he operated, and Dr. Issa was not otherwise familiar with the work environment at the Clyde Division. Issa Dep. at 58. Without knowing any of this information, Dr. Issa released Plaintiff to return to work without restrictions, noting that Plaintiff was not at any more risk for sudden incapacitation than any other patient "being treated for angina." *See* Dewey Dep. Exhibit 42.

Dr. Issa's verification did not alleviate Dr. Marshall's concerns, because it left open the possibility that Plaintiff was at risk for sudden incapacitation when compared with an average

person (as opposed to someone with angina).  Marshall Aff. ¶ 5.  Indeed, Dr. Issa conceded in this regard that people with angina are more at risk for incapacitation than the average person. Issa Dep. at 56.  Given this risk, and with his extensive knowledge of the Clyde Division working environment, Dr. Marshall did not believe Plaintiff could not safely operate a tow motor.  Marshall Dep. Aff. ¶ 5.  Thus, Dr. Marshall returned Plaintiff to work but restricted him from driving a tow motor or any other company vehicle.  *Id.*

Without the ability to drive a tow motor, Plaintiff could no longer work as a Materials Handler.  Schulz Aff. ¶¶ 6-7.  Therefore, he had to bid on another position.  *Id.* at ¶ 7.  Whirlpool temporarily assigned Plaintiff duties as a Gatekeeper/Tollkeeper (which was not a permanent, regular job) on or about March 15, 2008 until he could successfully bid on a permanent position. *Id*; Pl. Dep. at 122.  In this position, Plaintiff was responsible for keeping track of where parts were going in the site.  Pl. Dep. at 119.

### E.  Plaintiff Experiences Several Spasms At Work That Leave Him Fatigued, Dizzy, And/Or Lightheaded

In months that followed, Plaintiff experienced an increasing number of angina spasms at work:

- On June 10, 2008, Plaintiff experienced his fifth angina spasm in four days. Plaintiff's supervisor, Bill Hartwig, helped him to the EHC because Plaintiff reported feeling lightheaded and tired.  Plaintiff went home because the lightheadedness did not subside.  Pl. Dep. Exhibit 12; Pl. Dep. at 153-55.

- On June 17, 2008, Mr. Hartwig brought Plaintiff to the EHC after an angina spasm.  Plaintiff's pulse was rapid, and he experienced another spasm after arriving at the EHC.  Plaintiff requested to go home.  Pl. Dep. Exhibit 12; Pl. Dep. at 156.

- On August 4, 2008, Plaintiff almost passed out at his work station.  Dewey Dep. Exhibit 28.

- On August 6, 2008, Plaintiff was seen "doubled over" on a bench and ready to pass out.  His wife took him home.  *Id.*

6

- On September 5, 2008, Hartwig brought Plaintiff to the EHC after a spasm. Plaintiff was red in the face and short of breath. He left the EHC in an ambulance after spending approximately 22 minutes trying to recover. Plaintiff Dep. Exhibit 12; Pl. Dep. at 182-83.

- On September 26, 2008, Hartwig brought Plaintiff to the EHC after Plaintiff had experienced another spasm and had taken three Nitros. Plaintiff was dizzy and fatigued, so he went home. *Id.*

Following the attack on September 26th, Barbara Dewey, Human Resources Administrator in charge of the EHC, informed Plaintiff that he had to be cleared through Dr. Marshall to return to work. Pl. Dep. 183-84.

**F.      Plaintiff Has A Return To Work Evaluation With Dr. Marshall**

Plaintiff saw Dr. Marshall on October 2, 2008 for a return to work evaluation. Pl. Dep. at 185-86; Pl. Dep. Exhibit 21. Plaintiff presented a return to work verification from Dr. Roush which again stated that Plaintiff could return to work with no restrictions and was not at anymore risk for sudden incapacitation than "any other patient being treated for angina." *See* Pl. Dep. Exhibit 22. Since this verification again confirmed that Plaintiff was at risk for incapacitation, Dr. Marshall remained concerned that Plaintiff posed a safety risk. Marshall Aff. ¶¶ 6-7. Thus, Dr. Marshall followed up with Dr. Issa on October 6, 2008. *Id.* at ¶ 7.

Although Dr. Issa assured Dr. Marshall that Plaintiff could return to work, he provided no confirmation that Plaintiff was not at risk for sudden incapacitation. *Id.* For that matter, Dr. Issa later disclosed that Plaintiff had never informed him that he had experienced dizziness, fatigue, and lightheadedness in connection with angina spasms. Issa Dep. at 67. Dr. Issa testified that, had he known this information, he would have changed his opinion about Plaintiff's ability to return to work. *Id.* at 69.

On October 7, 2008, Dr. Marshall returned Plaintiff to work in any job he wished to do.

Pl. Dep. Exhibit 23. However, because he believed Plaintiff still could not safely drive a tow motor, Dr. Marshall restricted Plaintiff from doing so unless he had a six-month spasm-free period. *Id*; Marshall Aff. ¶ 7.

### G. Plaintiff Successfully Bids For A Multi-Process Team Member Position In The Paint Department

On October 8, 2008, Plaintiff bid on an available Multi-Process Team Member position in the Paint Department. Pl. Dep. at 191. Plaintiff's bid was successful, and he began working in that position on or about October 13, 2008. Schulz Dep. at 28; Schulz Dep. Exhibit 3.

As a Multi-Process Team Member, Plaintiff's duties included inspecting washer cabinets and lids to ensure the finish was proper, transferring cabinets if they needed to be painted a different color, and tooling, which involved placing parts on a conveyor line so that they could go through the paint systems, and then removing the parts from the conveyor line upon completion. Schulz Dep. at 28; Schulz Aff. ¶¶ 8-10. In the "tooling" position, the conveyor line is low-hanging and moves continuously. *Id* at ¶ 8. One of the rotations required Plaintiff to work alone on the upper floor of the site. *Id*.

Each of the duties described above are performed on a rotating basis, which means Plaintiff rotated from one position to the next every half hour. Pl. Dep. at 194. Employees are required to rotate so as to vary their muscle group usage and avoid excessive muscle fatigue or injury. Schulz Aff. ¶ 9. The ability to rotate through all of the positions is therefore an essential function of the Multi-Process Team Member job. *Id*. at ¶ 10.

### H. Plaintiff Experiences More Angina Spasms At Work

Almost immediately after returning to work, Plaintiff experienced two more angina spasms at work:

- On October 16, 2008, Plaintiff came to the EHC after an angina spasm and was pale and uncomfortable. Plaintiff was transported from the EHC to the

8

Emergency Room in an ambulance.  Pl. Dep. Exhibit 24.

- On October 22, 2008, Plaintiff came to the EHC after an angina spasm and spent approximately 30 minutes in the EHC trying to recover.  He was driven home by his wife.  Pl. Dep. Exhibit 25.

After the October 22nd attack, given that his spasms and associated symptoms were not abating, Doris Yontz, a registered nurse in the EHC, told Plaintiff he had to be cleared through Dr. Marshall before returning to work.  Pl. Dep. Exhibit 25.

### I.     Dr. Marshall Sends Plaintiff For An Independent Medical Examination

Dr. Marshall remained concerned about Plaintiff's ability to safely work at the plant, given his repeated spasms and the fact that Plaintiff continually reported feeling fatigued, dizzy and lightheaded.  Marshall Aff. ¶ 8.  However, Dr. Issa was insistent that Plaintiff could perform his duties.  *Id.*  In order to resolve this disagreement, Dr. Marshall ordered an independent medical examination ("IME") for Plaintiff, and one was scheduled for November 13, 2008 with cardiologist Haridas Biswas.  *Id.*; Pl. Dep. Exhibit 26.

In advance of the IME, Dr. Marshall wrote Dr. Biswas to inform him about Plaintiff's condition and symptoms.  Dewey Dep. Exhibit 22.  In pertinent part, Dr. Marshall asked whether Plaintiff posed a threat to his safety or the safety of others.  *Id.*

Plaintiff saw Dr. Biswas on November 13, 2008.  Pl. Dep. at 210.  Notwithstanding his history of spasms at work, Plaintiff told Dr. Biswas that he rarely experienced angina spasms, and when he did, Nitro quickly relived them.  Biswas Dep. Exhibit 2.  Plaintiff also denied any dizziness.  *Id.*  Based on that information, Dr. Biswas recommended that Plaintiff be returned to work with no restrictions.  *Id.*  Dr. Marshall accepted Dr. Biswas's recommendation and authorized Plaintiff to return to his position in the Paint Department.  Marshall Dep. at 14.

### J.     Plaintiff Experiences Additional Angina Spasms At Work

Plaintiff's spasms, and the severity of his symptoms, continued after his return to work:

9

- On January 22, 2009, Plaintiff was transported to the EHC via an in-plant ambulance after an angina spasm. Plaintiff felt fatigued and went home after spending 30 minutes in the EHC trying to recover. Pl. Dep. Exhibit 30.

- On January 30, 2009, Plaintiff came to the EHC because he had taken a Nitro on the way to work and wanted his blood pressure checked. Plaintiff was dizzy and fatigued. When those feelings did not subside, Plaintiff's daughter drove him home. Pl. Dep. Exhibit 12.

- On February 6, 2009, Plaintiff came to the EHC after having an angina spasm. He had taken two Nitros and was pale and fatigued. Plaintiff reported that there are days when he has taken nine Nitros. After spending 50 minutes in the EHC trying to recover, he went home. Pl. Dep. Exhibit 31.

After his spasm on February 6th, Plaintiff saw Dr. Issa on February 13, 2009 regarding his ability to return to work. Pl. Dep. Exhibit 33; Issa Dep. at 80. Plaintiff told Dr. Issa that he had experienced spasms at work, but they were promptly relieved with Nitro in three minutes. Pl. Dep. Exhibit 33. Again, Plaintiff did not inform Dr. Issa that he had experienced dizziness and fatigue, had to be carried to the Health Center in an ambulance, or that he generally had to sit in the EHC for between 20 to 50 minutes to recover from a spasm. *Id.* Based upon the information he had, Dr. Issa returned Plaintiff to work with no restrictions. *Id.*

Plaintiff saw Dr. Marshall on February 19, 2009. Pl. Dep. at 235. Although Dr. Issa had returned Plaintiff to work with no restrictions, Dr. Marshall remained concerned that Dr. Issa did not understand the risks present in the Clyde Division with the rapid pace that the machines and tow motors run. Marshall Aff. ¶¶ 10-11. Thus, while Dr. Issa may have felt that from a cardiac standpoint Plaintiff was able to return to work, Dr. Marshall believed that he was obliged to consider the Clyde Division's work environment and Plaintiff's job duties to decide whether Plaintiff's symptoms presented a safety risk to himself or others. Marshall Aff. ¶ 11. After considering those factors, Dr. Marshall decided that Plaintiff could return to work, but that he could not work around any machinery, at heights, or drive any company vehicles. Marshall Dep.

10

at 12. Since Plaintiff's position in the Paint Department required him to work at heights and around low-hanging conveyor lines and moving machinery, he could not return to that job. Schulz Aff. ¶ 12. At that point, Plaintiff remained on sick leave. Schulz Aff. ¶ 12.

### K.     Dr. Marshall Contacts Dr. Biswas Regarding Plaintiff's Angina Spasms

Dr. Marshall wrote Dr. Biswas on February 19, 2009 to inform him of the frequency and severity of the angina spasms Plaintiff had experienced following his IME and asked whether this information changed Dr. Biswas's original opinion. Marshall Dep. Exhibit 47. Dr. Marshall pointed out that in his regular duties, Plaintiff worked near machinery and out of the sight of others. *Id.*

On March 5, 2009, Dr. Biswas wrote Dr. Marshall back and noted that Plaintiff's symptoms appeared to pose some risk for his health. Biswas Dep. at 42-43; Biswas Dep. Exhibit 4. Given the symptoms described by Dr. Marshall, Dr. Biswas strongly recommended that Plaintiff be kept off work unless he could work under close observation. *Id.* at 45-46. Dr. Biswas was concerned about Plaintiff's safety and the possibility of a fatality occurring, since Plaintiff sometimes worked alone. *Id.* at 3. Dr. Biswas was also concerned because the angina itself and the use of Nitro can cause a patient to pass out. *Id.* at 42-43; 45; 59.[1]

Dr. Biswas did not opine as to why Dr. Issa believed Plaintiff could return to work without any restrictions because he had not seen Dr. Issa's records. *Id.* at 46. Dr. Marshall subsequently provided Dr. Biswas with the applicable records, and, after reviewing them, wrote

---

[1] In the correspondence between Dr. Marshall and Dr. Biswas, both expressed concern that Plaintiff had previously told nurses at the EHC that he had taken nine Nitros at one time without relief of his symptoms and could take up to 25 Nitros in one day. Plaintiff admitted in his deposition that he had stated he could take up to 25 Nitros in one day, but he denied having said he had taken nine Nitros at one time. Pl. Dep. at 229-230. Nevertheless, Dr. Biswas confirmed in his deposition, and Dr. Marshall concurred, that, even without the nine Nitros, Plaintiff still posed a safety due to the symptoms he exhibited and the fact that the angina itself can cause potential problems such as passing out. Biswas Dep. at 59; Marshall Aff. ¶ 10. Moreover, Dr. Issa testified that he had never advised Plaintiff he could take up to 25 Nitros in one day, as that would be dangerous. Issa Dep. at 87.

Dr. Marshall again on May 8, 2009. Biswas Dep. Exhibit 5. In that letter, Dr. Biswas stated that it appeared Drs. Issa and Stockton were not aware of the severity of the spasms Plaintiff had experienced at Whirlpool because they believed Plaintiff's chest discomfort was mild and promptly relieved with Nitro. *Id.* Indeed, as discussed above, Dr. Issa testified that Plaintiff had never informed him he was experiencing dizziness, lightheadedness, or fatigue. Issa Dep. at 47-48. Dr. Issa further testified that if he had known Plaintiff was experiencing those symptoms, it would have changed his opinion of Plaintiff's ability to return to work. Issa Dep. at 69. Dr. Issa also admitted that since Plaintiff was exhibiting these symptoms, it was possibly unsafe for him to operate machines and tow motors. *Id.*

Dr. Biswas recommended that Plaintiff only work under close observation and avoid working close to any potentially risky areas. Biswas Dep. Exhibit 5. On June 11, 2009, Dr. Marshall wrote Dr. Biswas to obtain clarification regarding the restrictions Dr. Biswas recommended. Marshall Dep. at 17-18. On June 17, 2009, Dr. Biswas clarified that "working under close observation" meant that Plaintiff should not work alone near areas with an assembly line or moving machinery. Biswas Dep. Exhibit 8. Dr. Biswas further stated that "potentially risky area" would include moving objects or moving machinery as well as being around water, pools, etc. *Id.* Dr. Biswas reiterated that this meant that Plaintiff should be working with fellow employees, and he should not work alone in a position at an assembly line with moving machinery. *Id.* Dr. Marshall adopted the recommendations of Dr. Biswas. Marshall Aff. ¶ 13.

### L.    Whirlpool Meets With Plaintiff Regarding His Restrictions And Position

When an employee has medical restrictions, Whirlpool conducts a restriction review of the employee's job duties to determine if the employee can perform the essential functions of his or her position. Schulz Aff. ¶ 13. On August 6, 2009, a restriction review of Plaintiff's job duties in the Multi-Process Team Member position was conducted in conjunction with the

restrictions recommended by Dr. Biswas. *Id.* It was determined that Plaintiff could not safely perform the essential functions of this position because one of the rotations required him to work alone and outside the presence of other employees. *Id.*

On August 13, 2009, Marc Schulz, Human Resources Generalist, Ms. Dewey, and Dr. Marshall met with Plaintiff to discuss the correspondence between Dr. Marshall and Dr. Biswas and the resulting restrictions. *Id.* at ¶ 14. They also discussed the review that had been conducted of Plaintiff's position, and that it had been determined he could not safely perform the essential functions of the position based on his restrictions. *Id.* Plaintiff was advised that he could bid on any position that he believed met his restrictions, and if a restriction review determined that he could safely perform the essential functions of the position, it would be given to him. *Id.* Until then, however, Plaintiff would remain on sick leave, unless he could confirm that he had been spasm-free for six months. *Id.*

Plaintiff indicated he had not been spasm-free for six months. Schulz Aff. ¶ 14. Mr. Schulz then advised Plaintiff that pursuant to Whirlpool's policies, he could remain on sick leave for a total of two years. Schulz Aff. ¶ 15. However, under the policy, only the first 26 weeks of sick leave are paid, and since Plaintiff's 26-week period ended on that day (August 13, 2009), the remainder of his leave would be unpaid. *Id.* Plaintiff remains on sick leave today. *Id.* at ¶ 16.

## III.  ARGUMENT

### A.    Standard of Review

The United States Supreme Court has clearly and unequivocally confirmed that the summary judgment procedure provided for in Federal Rule of Civil Procedure 56(c) "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). With respect to the "genuine

issue" requirement, the party opposing summary judgment may not simply rest on his pleadings, but must provide sufficient evidence such that a reasonable trier of fact could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

**B.**     **Plaintiff's Claims Under The ADA And Ohio Disability Law Fail As A Matter Of Law[2]**

**1.**     **Plaintiff Has No Direct Evidence Of Discrimination**

Plaintiff can prove his disability discrimination claims with direct or indirect evidence. Direct evidence is evidence that, if believed, proves the existence of improper discriminatory animus without inference or presumption. *Anthony v. United Tel. Co. of Ohio*, 277 F. Supp. 2d 763, 770 (N.D. Ohio 2002). To constitute direct evidence, the evidence must demonstrate discrimination without inference or presumptions. *Id.* at 774-75. Plaintiff has not come forth with any evidence that meets this standard. Accordingly, he must prove his case with indirect evidence.

**2.**     **Plaintiff Cannot Establish A *Prima Facie* Case Of Disability Discrimination**

Disability claims proceeding under the indirect method of proof follow the burden-shifting analysis set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). *See Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th Cir. 1999). To that end, Plaintiff must first prove a *prima facie* case of disability discrimination and establish that: (1) he suffers from a disability as defined by the ADA; (2) he is otherwise qualified to perform the requirements of his position, with or without reasonable accommodation; and (3) he was discriminated against solely

---

[2] Although Plaintiff has brought disability discrimination claims under both the ADA and O.R.C. § 4112.02, Ohio courts generally look to federal law in analyzing claims under O.R.C. § 4112.02. *City of Columbus Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206-07 (Ohio 1998). Accordingly, Counts One and Five of Plaintiff's First Amended Complaint should be treated as one for the purposes of deciding the instant Motion.

because of the disability. *Williams v. London Util. Com'n*, 375 F.3d 424, 428 (6th Cir. 2004).

If Plaintiff succeeds in establishing a *prima facie* case, the burden of production, not proof, then shifts to Whirlpool to articulate a non-discriminatory justification for the alleged adverse employment action. *Id.* Once Whirlpool meets its articulation burden, the *prima facie* case simply drops out of the picture. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). Plaintiff can then only survive summary judgment if he can produce sufficient evidence to show that Whirlpool's articulated reason was actually a pretext for discrimination. *Id.* The question at all times remains whether Whirlpool intentionally discriminated against Plaintiff, and the burden of proof with regard to that question remains at all times with the plaintiff. *Id.*

### a. Wurzel Cannot Establish He Is Disabled Under The ADA Or The ADAAA

In 2008, the ADA Amendments Act of 2008 ("ADAAA") was passed, which changed the definition of "disabled" within the meaning of the ADA. *Milholland v. Sumner County Bd. Of Educ.*, 569 F.3d 562, 565 (6th Cir. 2009). Although passed in 2008, the law did not become effective until January 1, 2009. *Id.* The Sixth Circuit has held that the ADAAA should not be applied retroactively; thus, complained-of acts that occurred prior to the effective date of the ADAAA should be analyzed under the prior version of the ADA. *Id.* However, complained-of acts that occurred after the effective date of the ADAAA should be analyzed under the ADAAA. *Id.* This case presents a unique situation, in that Plaintiff complains of acts that occurred both prior to and after the effective date of the ADAAA. However, Plaintiff cannot establish he is disabled under either version of the statute.

Under both the ADA and the ADAAA, Plaintiff may prove he is disabled by showing he: (1) has a physical or mental impairment that substantially limits one or more of major life activities; (2) has a record of such impairment; or (3) is regarded by Whirlpool as having such an

impairment. *Id.* at 565-66; *see also* 42 U.S.C. § 12102(2) (A)-(C). In their depositions, both Plaintiff and Dr. Issa unequivocally denied Plaintiff has an actual disability. Pl. Dep. at 41-42; Issa Dep. at 102. Thus, Plaintiff proceeds only under the "regarded as" prong of the ADA and claims that Whirlpool regarded him as limited in the major life activity of working. *See* Compl. ¶¶ 6 and 24. The prior version of the ADA and the amended version differ as to how Plaintiff can prove his "regarded as" claim, and thus, each will be discussed, in turn, below.

### (1)    Pre-ADAAA "Regarded As" Claim

To prove his "regarded as" claim with respect to the acts about which Plaintiff complains in 2008, Plaintiff must show Whirlpool regarded him as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." 29 C.F.R. § 1630.2(j)(3)(i). Courts have rejected claims such as Plaintiff's where the employer regarded the plaintiff as limited in performing a particular position or job rather than a broad range or class of jobs. *See Sullivan*, 197 F.3d at 811; *Davis v. Mich. Agric. Commodities, Inc.*, No. 08-10077, 2009 U.S. Dist. LEXIS 5582, at *23 (E.D. Mich. Jan. 12, 2009).

The court's decision in *Davis* presents an analogous situation. 2009 U.S. Dist. LEXIS 5582, at *4. In *Davis*, the plaintiff was employed as a general laborer and operated a fork truck, a front-end loading tractor, and a railcar mover. *Id.* After the plaintiff experienced several seizures at work, which left him dazed, disoriented, and dizzy, he was told not to return to work until he had clearance from a physician. *Id.* at 6-7.

The plaintiff returned to work, but his seizures still were not controlled, so he was assigned to a temporary grading position, where he could work without risk to himself or others. *Id.* at *7. The plaintiff was eventually terminated because his seizures rendered him unable to safely perform the essential functions of his assigned job, and the defendant had no other

16

positions available for which he was qualified. *Id.* at *14. The plaintiff filed suit, alleging the defendant regarded him as disabled because it perceived him as substantially limited in the major life activity of working. *Id.* at *16. The court rejected the plaintiff's argument, finding that the defendant only regarded the plaintiff as limited in working as a general laborer and not a broad class of jobs. *Id.* at *23. Thus, summary judgment was granted to the defendant. *Id.*

In the instant case, Whirlpool never regarded Plaintiff as physically incapable of performing his job duties or any other job for that matter. Whirlpool's concern at all times was whether Plaintiff could <u>safely</u> perform his job duties. Thus, the only restriction placed on Plaintiff in 2008 was that he not drive a tow motor or company vehicle. Consistent with *Davis*, this does not amount to a broad class of jobs. *See Davis*, 2009 U.S. Dist. LEXIS 5582, at *23. Thus, Whirlpool did not regard Plaintiff as disabled under the ADA.

### (2)    Post-ADAAA "Regarded As" Claim

To prove his "regarded as" claim with respect to the acts about which Plaintiff complained after January 1, 2009, Plaintiff must establish that he was "subjected to an action prohibited under [the ADAAA] because of an actual or perceived physical or mental impairment whether or not the impairment limits a major life activity." 42 U.S.C. § 12102(3)(A) (2009). While Whirlpool is certainly aware that Plaintiff suffers from Prinzmetal angina, Whirlpool never subjected Plaintiff to any prohibited action because of that condition or because it believed the condition rendered Plaintiff physically incapable of performing his duties. Rather, as discussed below, Whirlpool was concerned that, because of the symptoms Plaintiff experienced, Plaintiff posed a direct threat to the safety of himself and others. *See infra* Section III.B.2.b. Thus, Whirlpool did not regard Plaintiff as disabled under the ADAAA.

**b.     Plaintiff Is Not A Qualified Individual With A Disability Because He Poses A Direct Threat To His Safety And The Safety Of Others**

Even if Plaintiff could establish that Whirlpool regarded him as disabled, his disability claims would still fail because he posed a direct threat to his safety and the safety of others in the Division, and thus, was not qualified for his positions. "Direct threat" is defined as "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. 1630.2(r). An assessment of whether an employee poses a direct threat "shall be based on reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence." *Id.* The factors to be considered include: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm. *Id.*

In this case, Whirlpool based its determination that Plaintiff posed a direct threat to the health and safety of himself and others at the Clyde Division on the competent medical opinions of Dr. Marshall and Dr. Biswas, who were aware of Prinzmetal angina generally and the medications used to control it; Plaintiff's specific onset of the condition and associated symptoms; and Plaintiff's job duties and the work environment at the Clyde Division.

### (1)     Duration Of The Risk

There is no dispute that Plaintiff will suffer from Prinzmetal angina for the rest of his life. The duration of the risk associated with Plaintiff's condition is therefore unlimited. Beyond that, it is misleading to assess the "duration of the risk" from the vantage point of how long the risk lasts while Plaintiff is having a spasm. In that regard, it only takes a second to lose control of a tow motor, to fall off an elevated platform, or to fall into a moving assembly line or piece of machinery. That is all the time required for Plaintiff to cause himself, or a co-worker, significant

harm.

### (2)     Nature and Severity of the Potential Harm

Plaintiff's condition poses a risk of severe injury or death to himself or others in the positions he held. Were Plaintiff to become dizzy or lightheaded while driving a tow motor, or were he to lose consciousness, he could seriously injure or kill himself or someone else if he hit someone or something. Plaintiff acknowledged the inherent dangers in driving a tow motor and agreed that it was important that Whirlpool ensured he could do so in a safe manner. Pl. Dep. at 54; 97.

The same is true of the Multi-Process Team Member position Plaintiff held. One of the rotations required Plaintiff to work alone with machines on the upper level of the site without any other employees. If Plaintiff were to have a spasm and fall into one of the moving machines, no one would be there to find him for quite some time, which could result in serious injury or death. Moreover, in another rotation, Plaintiff was required to work near a low-hanging and moving conveyor line that carried large product-parts. Again, if Plaintiff were to have a spasm and become dizzy or fatigued, he could suffer serious injury or death.

### (3)     Likelihood That The Potential Harm Will Occur

Several courts have held that where the plaintiff's medical condition is uncontrolled, of an unlimited duration, and capable of causing serious harm, as is the situation in this case, injury may be considered likely to occur. *See Borgialli v. Thunder Basin Coal Co.*, 235 F.3d 1284, 1294-95 (10th Cir. 2000) (attributing greater weight to the "nature and severity" of the potential harm than to whether it is "likely" and "imminent" where a lapse in safety could cause serious bodily injury for multiple individuals); *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 894-95 (9th Cir. 2001) (holding that a direct threat can exist where the nature and severity of the potential harm is catastrophic, even if the likelihood that it will occur is small).

19

Plaintiff argues, however, that because he never actually caused an accident in the past or hurt himself or anyone else and his doctors returned him to work, Whirlpool should have let him continue to operate a tow motor or continue working in the Paint Department. The law does not require Whirlpool to wait until someone is hurt before taking action to protect its employees. *See Garner v. Gwinnett County, Georgia*, No. 96-3431, 1999 U.S. Dist. LEXIS 6370, at *10-11 (N.D. Ga. Mar. 20, 1999) (noting that the ADA did not require an employer to ignore a threat posed by an employee, rely on the conflicting medical opinions of the plaintiff's therapists, and take the risk that the plaintiff would injure his co-workers once reinstated).

Although Dr. Issa returned Plaintiff to work without restrictions, Dr. Issa did not know that Plaintiff was experiencing fatigue, lightheadedness, and dizziness. Nor did Dr. Issa know the extent of Plaintiff's duties at Whirlpool or the atmosphere at the Clyde Division (i.e., the type of vehicle Plaintiff drove, the constant interface between the tow motors and pedestrians and other moving machinery). Dr. Issa testified that had he been privy to all of the information Whirlpool had (i.e., the extent of Plaintiff's spasms, the number of Nitro Plaintiff had to taken to relieve the spasms, and the dizziness, lightheadedness, and fatigue Plaintiff experienced), it may have changed his view of whether Plaintiff could safely perform his job. To that end, both Dr. Biswas and Dr. Marshall knew all of this information, and both of them concluded that it was unsafe for Plaintiff to work in his positions without the restrictions described above.

### (4)   Imminence of the Potential Harm

At the time Whirlpool placed Plaintiff on leave in February of 2009, the potential threat for harm was imminent. At that point in time, Plaintiff experienced an angina spasm once a week while at work in just three short weeks. Moreover, he still complained of dizziness and fatigue, and in one instance, arrived in the EHC via an in-plant ambulance. Under these circumstances, Plaintiff was not qualified to perform his job as a Materials Handler or Multi-

Process Team Member in the Paint Department. *See, e.g., Moses v. Am. Nonwovens, Inc.*, 97 F.3d 446, 447-48 (11th Cir. 1996) (dismissing disability claims because employee with uncontrolled seizure disorder presented a "direct threat" where assigned tasks included sitting on a platform above fast-moving rollers, sitting underneath a conveyor belt with in-running pinch-points, and working next to exposed machinery that reached temperatures of 350 degrees); *Washington v. Occidental Chem. Corp.*, 24 F. Supp 2d 713, 728 (S.D. Tex. 1998) (employee with history of seizures posed a safety threat and, therefore, was not "qualified" to operate heavy machinery in a petrochemical plant); *Davis*, 2009 U.S. Dist. LEXIS 5582, at *27 (finding the plaintiff was a direct threat where his position was inherently dangerous, and he suffered from an unpredictable seizure disorder).

### c.  Whirlpool Did Not Take Any Unlawful Actions Against Plaintiff Solely Because Of His Angina

Finally, Whirlpool did not discriminate against Plaintiff solely because of his angina. Although the ADA prohibits discrimination based on stereotypes (*i.e.*, to take adverse action against an employee simply on the basis of the person's status as a disabled), when an employer acts based on an employee's record of harmful behavior that is directly attributable to a medical condition, "unlawful discrimination" is not present. *EEOC v. Kinney Shoe Corp.*, 917 F. Supp. 419, 429 (W.D. Va. 1996) (internal quotations omitted).

The court's decision in *EEOC v. Kinney Shoe Corp.* illustrates this principle.  In that case, the employer ("Kinney") terminated a shoe salesman with epilepsy out of concern that the uncontrolled seizures he had had during work rendered it unsafe for him to work at the store. *Id.* at 431-32.  The Court found that Kinney did not discriminate against the plaintiff and granted summary judgment in the employer's favor. *Id.*  The Court explained:

> Kinney did not fire Martinson because it stereotypically assumed that epileptics
> are a danger to themselves and others and because their seizures create security

problems. Rather, Kinney took the action it did because it had first-hand experience with Martinson's seizures, and their effects, and because it made an individualized determination that Martinson's seizures undermined the proper functioning of the store. That is, Kinney fired Martinson because of the specific attributes of his specific form of the disability, not simply because he had the general disability.

*Id.* at 430-31. [3] *See also Brohm v. J. H. Properties, Inc.*, 149 F.3d 517, 521 (6th Cir. 1998) (hospital's decision to terminate anesthesiologist who suffered from a sleeping disorder was not discriminatory where the decision was based on evidence employee had been sleeping on the job and not unfair presumptions about the condition). That is precisely what happened here.

Whirlpool's decisions regarding Plaintiff were not based on generalized assumptions about Prinzmetal angina. Rather, Whirlpool relied upon the opinions of two doctors – Dr. Marshall and, Dr. Biswas – both of whom had examined Plaintiff and reviewed information about the specific symptoms he had exhibited at work. In that regard, Dr. Marshall knew that Plaintiff's angina was the Prinzmetal form and therefore unstable. Dr. Marshall knew that Plaintiff had experienced at least 13 spasms at work between March and October 2008 and another 3 spasms in January and February 2009 alone. Dr. Marshall further knew that Plaintiff had reported symptoms associated with these spasms, including dizziness, lightheadedness, and fatigue associated with these spasms.

Applying what he knew about Plaintiff's symptoms to the work environment at Clyde Division (such as the heavy tow motor traffic and automated, moving machinery and assembly lines), Dr. Marshall determined that Plaintiff's condition posed a safety risk. Dr. Biswas

---

[3] The court rendered this holding, despite having rejected the employer's argument that the plaintiff was a direct threat. Of course, it is understandable why the court would have rejected this argument in *Kinney Shoe Corp.* After all, as the court noted, the plaintiff worked in a shoe store, and little harm could come to himself (given the steps the employer had taken to prevent plaintiff from having to climb ladders) or to others from his seizures. *Kinney Shoe Corp.*, 917 F. Supp. at 428. The present case is different. Even Plaintiff acknowledged that he could seriously injure or kill someone if he hit them with a tow motor, and there can be no genuine dispute that the same danger exists were Plaintiff to fall into on-coming traffic himself, or were he to fall into, for example, an operating drill press or assembly line.

ultimately concurred. In short, Whirlpool took actions against Plaintiff based on the attributes of his specific symptoms and not simply because he had angina.[4]

Whirlpool's position in this regard is bolstered by the fact that the Company had been aware of Plaintiff's condition and later diagnosis for years. Yet, no adverse action had ever been taken against him. The court in *Kinney Shoe Corp.* similarly noted that Kinney's knowledge for months of the plaintiff's condition and seizures, without having taken any adverse action, "belies the assertion that Kinney acted with discriminatory intent in terminating [the plaintiff]." *Id.* at 432.

The court in *Kinney Shoe Corp.* also found it significant that Kinney had created a different position for the plaintiff and took other proactive steps to ensure his continued employment. *Id.* Similarly, Whirlpool took no action with respect to Plaintiff until Dr. Marshall became concerned for the safety of Plaintiff and his co-workers. Even then, the Company took several proactive steps (removing Plaintiff's tow motor license, reassigning Plaintiff to the Gatekeeper/Tollkeeper position, allowing Plaintiff to bid on the job in the Paint Department), in an attempt to alleviate this safety concern short of removing Plaintiff from the workforce.

### 3. Whirlpool Was Under No Duty To Accommodate Plaintiff

Since Plaintiff claims only that he was "regarded as" disabled, rather than actually disabled, Whirlpool had no duty to accommodate him. *See Workman v. Frito-Lay, Inc.*, 165 F.3d

---

[4] Although addressed in the context of the *prima facie* case, this is essentially the same argument for the pretext analysis. In other words, Whirlpool articulated a legitimate, non-discriminatory justification for its actions towards Plaintiff – *i.e.*, the safety concerns associated with his symptoms – and there is no evidence that this was a pretext for intentional discrimination. In this regard, Plaintiff has no evidence that Whirlpool did not honestly believe, based upon objective facts and reasonable investigation, that Plaintiff posed a safety risk to himself and others, and that this was why the Company acted as it did. *See Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (under the "honest belief" rule, as long as an employer has an honest belief in its proffered nondiscriminatory reason, the employee cannot establish that the reason was pretextual even if it is ultimately shown to be incorrect).

460, 467 (6th Cir. 1999) ( noting that if a person is only "regarded as" having a disability, this "obviate[s] the Company's obligation to reasonably accommodate [the employee].").  Moreover, Plaintiff stated in his deposition that he does not need an accommodation to perform his job.  Pl. Dep. at 133.  Therefore, Whirlpool was under no obligation to accommodate him.

### C.    Plaintiff's FMLA Claims Fail As A Matter Of Law

Plaintiff asserts that Whirlpool interfered with his rights under the FMLA when it placed him on sick leave, even though his physicians said he could return to work with no restrictions. Additionally, Plaintiff claims that Whirlpool retaliated against him in violation of the FMLA.  As set forth below, however, Plaintiff cannot establish Whirlpool violated the FMLA under either theory, and thus, summary judgment should be granted to Whirlpool on these claims.

### 1.    Plaintiff Cannot Establish Whirlpool Interfered With His FMLA Rights When It Placed Him On Sick Leave

An employer may place an employee on FMLA leave, even if the employee does not request it, as long as the employee has a "serious health condition" and the leave is FMLA-qualifying.  *Wysong v. The Dow Chem. Co.*, 503 F.3d 441, 449 (6th Cir. 2007); *Harvender v. Norton Co.*, No. 96cv653, 1997 U.S. Dist. LEXIS 21467, at *23 (N.D.N.Y 1997) ("[T]here is no right under the FMLA to bring an action against an employer for placing an eligible employee on leave."); *Moss v. Formosa Plastics Corp.*, 99 F. Supp. 2d 737, 741 (M.D. La. 2000) (granting summary judgment on FMLA involuntary leave claim because nothing in the FMLA prevents an employer from requiring an eligible employee to take FMLA leave).

The term "serious health condition" is defined as "an illness, injury, impairment or physical or mental condition that involves inpatient care . . . or continuing treatment by a health care provider . . . ."  29 C.F.R. § 825.113(a).  A serious health condition involving continuing treatment by a health care provider includes chronic conditions that require periodic visits for

24

treatment by a health care provider, continue over an extended period of time, and may cause episodic rather than a continuing period of incapacity. *Id.* at § 825.115(c)(1)-(3).

Plaintiff's Prinzmetal angina qualifies as a serious health condition under the FMLA. Plaintiff identified his condition as FMLA qualifying in his Complaint. *See* Compl. ¶ 17. Moreover, Plaintiff applied and was approved for FMLA in relation to his angina on multiple occasions. In each of those instances, his doctors certified that Plaintiff's angina was a FMLA-qualifying condition. Therefore, Whirlpool did not violate Plaintiff's FMLA rights when it placed him on sick leave in connection with his angina. *Harvender*, 1997 U.S. Dist. LEXIS 21467, at *19; *Moss,* 99 F. Supp. 2d at 741.

Plaintiff argues that his FMLA rights were violated because Whirlpool would not return him to work despite the fact that his doctors had released him. This argument has no merit. Under the ADA, an employer may require an employee to submit to a medical examination to determine his ability to perform job-related functions. *See* 42 U.S.C. § 12112(d)(4); 29 C.F.R. § 1630.14(c). Similarly, the EEOC Enforcement Guidelines allow such exams when an employer "has a reasonable belief, based on objective evidence, that "an employee will pose a direct threat due to a medical condition." Disability-Related Inquiries and Medical Examinations Under the ADA, 2 EEOC Compliance Manual § 902:0185 (2000). Thus, regardless of the fact that his doctors released him, Whirlpool was entitled to ensure that Plaintiff did not pose a safety risk.

In *Porter v. United States Alumoweld Co, Inc.*, for example, the plaintiff worked as a machine operator and suffered back injuries that called into question his ability to perform his job. 125 F.3d 243, 245 (4th Cir. 1997). The plaintiff's physician released him to work "without any limitations." *Id.* The defendant told the plaintiff it needed more information in the form of a functional capacity evaluation to determine whether he was physically able to return to work. *Id.*

25

When the plaintiff refused, he was terminated. *Id.* The plaintiff then brought suit under the ADA and the FMLA. *Id.*

The court rejected the plaintiff's claim under the FMLA based on the fact that the requested examination met the requirements for a medical exam under the ADA. *Id.* at 247. The court reasoned that because the plaintiff's job required lifting and pulling, and he had encountered problems carrying out those duties due to his back injury, the employer's request for a medical exam to determine whether the plaintiff was physically able to perform his duties was job-related and consistent with business necessity. *Id.* Thus, it was allowed by the ADA, and therefore, did not violate the FMLA. *Id.* at 247.

In the instant case, Plaintiff experienced several angina spasms at work that left him dizzy and fatigued to the point that he requested to go home because he could not safely perform his job duties. As a result, Whirlpool required him to see Dr. Marshall, and later Dr. Biswas, upon returning to work to ensure he could safely perform the essential functions of his job. Since these exams were job-related and consistent with business necessity, it was permitted by the ADA (as was the Company's decision to place restrictions on Plaintiff's return to work consistent with its safety concerns). 42 U.S.C. § 12112(d)(4); 29 C.F.R. § 1630.14(c); *Porter*, 125 F.3d at 246. Plaintiff's FMLA claim fails as a matter of law. *Porter*, 125 F.3d at 247.

### 2.     Plaintiff Cannot Establish A Retaliation Claim Under The FMLA

While Plaintiff asserts in his Complaint that he suffered retaliation in violation of the FMLA, he testified at his deposition that he does not believe he was retaliated against:

> Q.   Do you believe that you've been retaliated against in any way
> for using family and medical leave?
>
> A.   No.

Pl. Dep. at 264. This testimony alone is sufficient grounds for this Court to grant summary

judgment to Defendant on Plaintiff's FMLA retaliation claim. *Conner-Clement v. Trinity Indus., Inc.*, No. 3:07cv1154, 2009 U.S. Dist. LEXIS 6125, at *19 (M.D. Tenn. Jan. 28, 2009) (dismissing discrimination claim where the plaintiff admitted in her deposition she did not believe she had suffered that type of discrimination).

Even if Plaintiff had not made this fatal admission, his FMLA retaliation claim would fail. Discovery did not reveal any direct evidence of retaliation under the FMLA, and thus, Plaintiff has to prove his claim under the indirect method of proof. *See Morris v. Family Dollar Stores of Ohio, Inc.*, 320 F. App'x 330, 338 (6th Cir. Mar. 31, 2009). To establish a *prima facie* case of FMLA retaliation, Plaintiff must establish the following by a preponderance of the evidence: (1) he engaged in an activity protected by the FMLA; (2) Whirlpool knew of the protected activity; (3) Whirlpool thereafter took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Id.* Whirlpool must then articulate a legitimate, nondiscriminatory reason for its actions. *Id.* Plaintiff then has the burden establishing that Whirlpool's legitimate, nondiscriminatory reason is a pretext for discrimination. *Id.*

Plaintiff cannot establish a *prima facie* case of retaliation because he cannot show a causal connection between the protected activity (i.e., his taking FMLA leave) and Whirlpool's decision to place him on sick leave. *See Dobrowski v. Jay Dee Contractors, Inc.*, No. 07-13267, 2008 U.S. Dist. LEXIS 43701, at *19 (E.D. Mich. June 3, 2008) (granting summary judgment where the plaintiff could not establish a causal connection between his FMLA leave and the adverse employment decision). Whirlpool had been granting Plaintiff's requests for FMLA leave for years without incident. It was only after Whirlpool became concerned for Plaintiff's safety that it required Plaintiff to see Dr. Marshall and Dr. Biswas and eventually restricted his

activities.  As discussed above, the Company's actions in this regard were consistent with its

rights and obligations under the ADA.  *See Supra* Section III.D.1.  Plaintiff has produced no

evidence that this reason is pretextual, and in fact, testified in his deposition that Whirlpool's

concerns were valid.  Accordingly, his FMLA retaliation claim should be dismissed.  *Dobrowski*,

2008 U.S. Dist. LEXIS 43701, at *20 (granting summary judgment on FMLA retaliation claim

where Plaintiff could not show that the employer's legitimate, nondiscriminatory reason was

pretextual).

### D.  Plaintiff Cannot Establish An Intentional Infliction Of Emotional Distress Claim

To establish a claim for intentional infliction of emotional distress, Plaintiff must show:

(1) Whirlpool intended to cause him emotional distress, or knew or should have known that the

actions taken would result in serious emotional distress; (2) Whirlpool's conduct was extreme

and outrageous; (3) Whirlpool's actions proximately caused Plaintiff psychic injury; and (4) the

mental anguish Plaintiff suffered was serious.  *Hanly v. Riverside Methodist Hosp.*, 603 N.E.2d

1126, 1132 (Ohio Ct. App. 1991).  The Ohio Supreme Court has recognized that liability for

intentional infliction of emotional distress can only be found "where the conduct has been

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

*Yaeger v. Local Union 20*, 453 N.E.2d 666, 671 (1983), *abrogated on other grounds by Welling

v. Weinfield*, 866 N.E.2d 1051 (Ohio 2007).

Plaintiff has no evidence that Whirlpool engaged in any conduct that can be regarded as

so outrageous in character and extreme in degree as to be regarded as outside all possible bounds

of decency, atrocious, or utterly intolerable in a civilized community.  Instead, Plaintiff relies on

nothing more than the facts surrounding the decisions made regarding his ability to safely

perform his job duties to support this claim. The Sixth Circuit has held that allegedly unfair employment decisions, without more, are an insufficient basis for claims for intentional infliction of emotional distress. *See Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 376 (6th Cir. 1999) (plaintiff who failed to allege any facts beyond those supporting his discrimination claim did not establish a claim for intentional infliction of emotional distress). Thus, Plaintiff's intentional infliction of emotional distress claim fails as a matter of law.

### E. Plaintiff Cannot Establish A Negligent Hiring, Supervision, or Retention Claim

Plaintiff claims that Whirlpool was negligent in hiring, supervising, and/or retaining its supervisory and managerial staff, which were allegedly incompetent in administering Whirlpool's policies regarding disability discrimination, harassment, and the FMLA. *See Compl.* ¶¶ 14-15. Thus, Plaintiff contends that Whirlpool is liable under theories of negligent hiring, retention, and supervision. Because the elements of these claims are the same, they will be addressed together.

To establish his negligent hiring, retention, and supervision claims, Plaintiff must show proof of five elements: (1) the existence of an employment relationship; (2) the employee's incompetence; (3) Whirlpool's actual or constructive knowledge of such incompetence; (4) the employee's act or omission which caused Plaintiff's injuries; and (5) Whirlpool's negligence in hiring or retaining the employee was the proximate cause of Plaintiff's injuries. *Watson v. City of Cleveland, et al.*, 202 F. App'x 844, 857 (6th Cir. Sept. 8, 2006) (*citing Linder v. Am. Nat'l Ins. Co.*, 798 N.E.2d 1190, 1197 (Ohio Ct. App. 2003)). When evaluating claims for negligent hiring, retention, and supervision, "foreseeability [is] the test of employer liability." *Hout v. City of Mansfield, Ohio*, 550 F. Supp. 2d 701, 745 (N.D. Ohio 2008).

To that end, if Plaintiff fails to show through evidence that the employee at issue had any

criminal or tortious propensities, summary judgment in Whirlpool's favor on negligent hiring and retention is proper. *Id. See also Byrd v. Faber*, 565 N.E.2d 584, 590 (Ohio 1991) (holding trial court correctly dismissed negligent hiring claim where the plaintiff failed to allege that the employee at issue "had a past history of criminal, tortuous [sic], or otherwise dangerous conduct about which the religious institution knew or could have discovered through reasonable investigation"); *Dawson v. Airtouch Cellular*, 42 F. Supp. 2d 767, 773 (S.D. Ohio 1999) (finding negligent retention claim failed because Plaintiff had not alleged that his supervisor had any criminal or tortuous tendencies and provided no support for her claim that her manager was a "horribly dangerous" manager). Finally, to prevail in a negligent retention claim against an employer, the plaintiff must also be able to establish a tort claim against the individual employee. *Hout*, 550 F. Supp. 2d at 745.

In the instant case, Plaintiff's negligent hiring, supervision, and retention claims fail because Plaintiff has produced no evidence that any of his managers or supervisors had criminal, tortious or otherwise dangerous backgrounds. Indeed, Plaintiff testified in his deposition that he had no knowledge regarding the backgrounds of his managers. Pl. Dep. at 267. Moreover, Plaintiff has produced no evidence that he suffered a tort at the hands of a Whirlpool employee. Finally, Plaintiff has no evidence to suggest that any of his managers or supervisors were incompetent or that Whirlpool knew of their alleged incompetence. Absent such evidence, Plaintiff cannot prove that Whirlpool negligently hired, retained, or supervised plaintiff's managers/supervisors. Therefore, Whirlpool is entitled to summary judgment on these claims. *Hout*, 550 F. Supp. 2d at 746.

## IV. CONCLUSION

For the foregoing reasons, Whirlpool respectfully request that the Court issue an Order granting its Motion for Summary Judgment and dismissing Plaintiff's claims in their entirety,

with prejudice.

Respectfully submitted,

WHIRLPOOL CORPORATION,


By: _____ /s/Raven A. Winters _____
One of its attorneys

Kent D. Riesen (Local Counsel)
ANSPACH MEEKS ELLENBERGER LLP
300 Madison Avenue, Suite 1600
Toledo, OH 43604
419.246.5757
419.321.6979

Adam C. Wit (*admitted pro hac vice*)
Raven A. Winters (*admitted pro hac vice*)
LITTLER MENDELSON
A Professional Corporation
200 N. LaSalle Street
Suite 2900
Chicago, IL  60601
Telephone: 312.372.5520
Facsimile: 312.372.7880
Attorneys for Defendant


Dated: February 8, 2010

## <u>CERTIFICATION PURSUANT TO LOCAL RULE 7.1(F)</u>

I, Raven A. Winters, attorney for Whirlpool Corporation, certify that the above-captioned case has been assigned to the Expedited Track, and that the page limitation for memoranda filed in support of dispositive motions in such cases is ten pages.  Pursuant to the instructions of Judge Carr's staff, Whirlpool has filed a Motion for Leave to File a Memorandum in Excess of Ten Pages so that it may file a 31-page Memorandum in Support of its Motion for Summary Judgment.  Defendant's Memorandum in Support of its Motion for Summary Judgment does not exceed the 31-page limitation requested in its Motion.

/s/Raven A. Winters
Raven A. Winters

## CERTIFICATE OF SERVICE

Raven A. Winters, hereby certifies that on February 8, 2010, Defendant Whirlpool Corporation's Memorandum in Support of Its Motion for Summary Judgment was filed electronically.  Notice of this filing will be sent to flandry@aol.com by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


/s/Raven A. Winters

Raven A. Winters
