IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| **BRIAN WURZEL,** ) | Case No. 3:09CV00498 |
| **Plaintiff** ) | |
| ) | Chief Judge James G. Carr |
| ) | |
| vs. ) | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| **WHIRLPOOL CORPORATION,** ) | |
| **Defendant** | |
| ) | Francis J. Landry (0006072) |
| ) | **WASSERMAN, BRYAN, LANDRY AND HONOLD, LLP** |
| ) | 405 N. Huron Street, Suite 300 |
| ) | Toledo, Ohio 43604 |
| | (419) 243-1239 |
| | Fax: (419) 243-2719 |
| | Email: Flandry308@aol.com |
| | Attorney for Plaintiff, Brian Wurzel |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## I. STATEMENT OF THE CASE

### A. Procedural History

Plaintiff has brought his First Amended Complaint in which he seeks redress for disability discrimination and harassment under Ohio Revised Code Sections 4112.02(A) made actionable pursuant to Ohio Revised Code Section 4112.99 as amended and under the Americans with Disabilities

1

Act, 42 U.S.C. Sections 12101 et seq. Plaintiff has also brought claims for Family and Medical Leave Act interference and retaliation under 29 U.S.C. Sections 2615 and 2617 and claims under Ohio law for intentional infliction of emotional distress and negligent hiring, retention and supervision. Discovery ensued in this action after which Defendant filed a Motion for Summary Judgment.

### B. Statement of Facts

Defendant has set forth the procedural history of disputes that gave rise to issues between these parties arising from Defendant's having placed Plaintiff on sick leave when there was no job available that he could do safely at page 1 of its Memorandum. Defendant has also correctly referenced Plaintiff's length of employment and his job duties at page 2 of its memorandum. However, Plaintiff contends that the crux of this case involves a proper interpretation of the nature of his medical condition and the ongoing methods that Defendant went to override and mis characterize the nature of his condition as part of an ongoing effort to keep him out of work. Plaintiff does note that the Defendant has recently called him back to work in the Paint Shop as of March 2, 1010 after he presented evidence from his treating cardiologist that he was symptom free for over six months.

Plaintiff therefore directs this Court first to review the pertinent medical depositions for guidance and as the best explanations for his true medical status.

### MARK G. ISSA, D.O., F.A.C.C.

On October 29, 2009, the Defendant deposed Mark G. Issa, D.O., F.A..C.C. Dr. Issa testified that he has been in private practice for 11 years with Northwest Ohio Cardiology Consultants and that he is a general cardiologist. Issa dep. at p. 6. He noted that Northwest Ohio Cardiology Consultants was a single specialty group that has been in practice for over twenty years and that it is the largest cardiology group in the area of Toledo. Issa dep. at p. 7. Dr. Issa noted that prinzmetal angina was a spasm of the

2

coronary artery or a narrowing related to hyperactive smooth muscle in the arteries. But he noted that it was just a transient condition and had nothing to do with atherosclerotic disease. Issa dep. at p. 10. Dr. Issa stated that prinzmetal angina might manifest itself in terms of chest discomfort and that dizziness, lightheaded ness and fatigue were very unlikely. Issa dep. At p. 12. Dr. Issa explained that he generally treated this condition with a long acting nitrate, calcium channel blocker and, in some cases, magnesium oxide. He also noted a new drug Renexa that has been used recently to reduce the spasm. Issa dep. at p. 13. The primary course of treatment is pharmaceutical. Issa dep. at p. 13. Dr. Issa stated that prinzmetal angina is a rare condition. When patients experience chest pain, they could take nitroglycerin that should give them immediate relief. Issa dep. at p. 17. Dr. Issa testified that Plaintiff was his patient and that he had diagnosed Mr. Wurzel with prinzmetal angina. Issa dep. at p. 18. This diagnosis occurred in October or November of 2007 as a result of a cardiac catheterization that was performed at that time. Issa dep. at pp. 19, 20. As of December 13, 2007, Dr. Issa noted that Mr. Wurzel had rare episodes of chest pain that were relieved with nitroglycerin, which he described as being two to three times per month. Issa dep. at pp. 37, 38. ***On March 13, 2008, Dr. Issa had prescribed nitrate and a low dose of procardia. Issa dep. 45-48. Dr. Issa testified that he thought that Plaintiff was very stable on those medications. Issa dep. at p. 50.*** Dr. Issa released Plaintiff to return to work on March 13, 2008. He felt that Plaintiff was stable enough to go back to work. Issa dep. at p. 52. The note indicated that it was okay for Plaintiff to drive a forklift or two motor. Issa dep. at p. 53, and Defendant's Exibit Issa 5 thereto. Dr. Issa explained that just taking nitro p.r.n. (as needed) was not a disabling condition for a patient to not allow him to perform his job. Issa dep. at p. 57. Dr. Issa had been made aware by Plaintiff that Plaintiff drove and operated machines. Issa dep. at p. 58. Moreover, Dr. Issa noted that as of March 13. 2008, Plaintiff could do any type of job and he did not

3

put him on any kind of restriction. Issa dep. at p. 59. He testified that had he known that Wurzel's position involved the operation of heavy machinery, which operated on an automatic basis which you couldn't simply and easily turn on and off, it would not have changed his opinion. Issa dep. at p. 60. Dr. Issa testified that he felt that the course of action of Dr. Marshall, the company doctor, in refusing to release Plaintiff to return to work unless he was spasm free for at least six months, was unreasonable. Issa dep. at p. 62.

Plaintiff next met with Dr. Issa on June 17, 2008. This report noted increased frequency of symptoms. Issa dep. at p. 64, Defendant's Exhibit Issa 7 thereto. Dr. Issa noted that Plaintiff's symptoms were at this time on a daily basis. Issa dep. at p. 65. Dr. Issa noted that if he had been aware that Mr. Wurzel noted that he was suffering from dizziness, lightheadedness or fatigue, it might possibly have been unsafe for him to operate machinery or to work in an unsupervised area when working around heavy machinery and moving equipment. Issa dep. at pp. 69, 70. Dr. Issa's associate Dr. Roush, released Plaintiff to return to work in October of 2008. See Issa deposition, Deposition Exhibit Issa 8 thereto which notes okay to drive tow motor or forklift. Dr. Issa testified that he was aware that company physician Dr. Marshall had concerns associated with returning Mr. Wurzel to work. He noted that that was why they sent the letter as they felt in their opinion that Plaintiff was stable. Issa dep. at p. 74.

Dr. Issa noted that the next time that he saw Plaintiff was on February 13, 2009. Issa dep. at p. 80. Dr. Issa stated that he felt that Plaintiff was still doing well. Issa dep. at p. 82. Dr. Issa noted that if there were records indicating that Plaintiff had at least five spasms at work in which he had to go to the health center between October of 2008 and February of 2009, it would not have changed his opinion as to the nature of Plaintiff's condition or the course of treatment because he was going to make an

4

adjustment to Wurzel's medication at the time. Issa dep. at pp. 83, 84. Dr. Issa's Impression/Plan for February of 2009 noted Wurzel's symptoms as stable. Issa dep. at p. 86. Dr. Issa returned Plaintiff to work on February 13, 2009. Dr. Issa testified that he felt that Plaintiff's symptoms were stable and that he was able to perform any job. Issa dep. at pp. 95, 96. Dr. Issa admitted that he consistently wrote in his reports that Plaintiff was able to gain control over his angina with nitroglycerin pills in a matter of minutes after the onset. He also noted that is was very rare for a person with prinzmetal angina to become lightheaded, dizzy or even lose consciousness without any advanced warning. Issa dep. at pp. 99-100. Dr. Issa summarized by stating that looking back to the day the condition was diagnosed to the present day, he did not feel that Plaintiff was restricted in any way in terms of what he can and cannot do and that he felt safe and comfortable that Plaintiff is able to perform his work. Issa dep. at pp. 102, 106. Plaintiff contended that he told Dr. Issa that he did a lot of heavy lifting at times, the he drove a forklift, that there is a substantial number of people around. Wurzel dep. at p. 109.

**FREDERICK STOCKTON, M.D.**

On October 29, 2009, the Defendant conducted the deposition of Frederick Stockton, MD. Dr. Stockton testified that he is a specialist in cardiology and that he has been a fellow of the American College of Cardiology since 1997. Stockton dep. at pp. 6, 7. Dr. Stockton testified that he did a cardiac catheterization on Mr. Wurzel in 2007. Stockton dep. at p. 9. Dr. Stockton concluded that the blockages were spasms and he described the procedures used to determine that fact. Stockton dep. at p. 17. He confirmed that Mr. Wurzel was diagnosed as having prinzmetal angina. Stockton dep. at p. 18. Dr. Stockton opined that the symptoms generally associated with Prinzmetal angina involved chest pain and breathlessness. Stockton dep. at p. 22. Dr. Stockton's second interaction with Plaintiff was a visit on February 17, 2009. Stockton dep. at p. 21. At that time, Dr. Stockton testified that he put

5

no limitations on Plaintiff from a cardiac standpoint. He enumerated hang gliding, bungee jumping, parasailing, jogging, heavy lifting, and bending. Stockton dep. at p. 32. Dr. Stockton testified that in February of 2009, Mr. Wurzel's condition did not limit or restrict his ability to do anything from a physical or mental standpoint and he had no restrictions as far as he was concerned. Stockton dep. at p. 33. Dr. Stockton noted also that had Plaintiff told him that he was taking up to 9 nitroglycerin tablets in a given day, it would not have changed his opinion but would have pushed the doctor to try and encourage him to quit smoking and they would have adjusted medications. Stockton dep. at pp. 35, 36. *Although Dr. Stockton testified that he had no idea of what Mr. Wurzel did other than the fact that he worked at Whirlpool, he stated that "...I have no objective evidence of LV dysfunction, no indication to limit him from a cardiac standpoint, no evidence of syncope. And that pretty much allows you to do, from a cardiac standpoint, any job in the world, including flying a plane or driving a bus."* Stockton dep. at p. 38.

**ROBERT A. MARSHALL, M.D. (Company Physician)**

The history of the Defendant's treatment of Plaintiff as evidenced in its Memorandum in Support of its Motion for Summary Judgment, is replete with continuous efforts to circumvent or override the reasoned decisions of Plaintiff's treating experts. The Defendant acted based on recommendations of its Plant Physician, Robert A. Marshall, MD. Dr. Marshall is a family physician. Marshall dep. at p. 4. Dr. Marshall testified that he was aware that Plaintiff was treating for Prinzmetal Angina and that he was treating with Northwest Ohio Cardiology Consultants. Marshall dep. at p.7. Dr. Marshall admitted that his concern was that being very familiar with the internal operations and safety issues within the plant that one of these episodes could place Plaintiff in an unsafe environment for himself and others around him. Dr. Marshall made the decision regarding the restrictions. He had no

6

information from Plaintiff's two cardiologists other than the return to work notes that he received from them. Marshall dep. at pp. 7, 8. Dr. Marshall testified that on March 17, 2008, he placed restrictions on Mr. Wurzel of no driving two motor and no driving company vehicles. Marshall dep. at pp. 9, 10. Wurzel then returned to work as a gatekeeper. Wurzel dep. at p. 116. Dr. Marshall stated that he returned Mr. Wurzel to work on December 2, 2008 and stated that the driving restriction was in place at the time but was not written down. See Marshall dep. at p. 11, and Plaintiff's Exhibit Dewey 38. As of February 19, 2009, Dr. Marshall noted that Wurzel may return to work with restrictions–no working around machinery, no driving company vehicles or working at heights until his medical condition is documented to be under control. Marshall dep. at p. 12, and Plaintiff's Exhibit Dewey 39. At that time, Dr. Marshall stated that he was working with Dr. Biswas, the IME physician. Marshall dep. at p. 12. Before this time, Dr. Marshall was aware that Plaintiff had prinzmetal angina in 2007 when Plaintiff came back from a cardiac catheterization. He noted that Dr. Roush reassured him that Plaintiff was able to return to work and he (Dr. Marshall) did return Plaintiff to work without restrictions at that time. Marshall dep. at p. 13. Dr. Marshall received Dr. Biswas's first IME report on November 25, 2008. In this report, Dr. Biswas indicated that he did not have any objections to Plaintiff going back to work without restrictions. Marshall dep. at p. 13. Dr. Marshall then returned Plaintiff on December 2, 2008. However, on February 19, 2009, Dr. Marshall worte Dr. Biswas asking for additional consideration in light of new information. Dr. Marshall based this letter on reports that Plaintiff had taken nine nitroglycerin with no relief of his symptoms and the triaging nurse had noted Plaintiff to be very ill in appearance. Marshall dep. at pp. 14.15 and Plaintiff's Exhibit 47 thereto. Based on this letter, Dr. Biswas recommended that if Plaintiff returns to work he should work under close observation and if that was not possible, he recommended that Plaintiff be kept off of work.

Marshall dep. at p. 15. On June 11, 2009, Dr. Marshall again wrote Dr. Biswas (IME Doctor) asking for more clarification. Marshall dep. at p. 17, Plaintiff Exhibit 50. Dr. Biswas responded on June 17, 2009 noting that patient took between 10 to 20 nitroglycerin at one time. Dr. Biswas noted that Plaintiff should not work in a position at an assembly line as well as with moving machinery. Dr. Biswas also noted problems with moving objects or moving machinery as well as being around water, pools, etc. Marshall dep. at pp. 18, 19, Deposition Exhibit 51 thereto. Dr. Marshall then concurred with the recommendations of Dr. Biswas. Marshall dep. at p. 19. The decision to seek out Dr. Biswas, a cardiologist, was explained by Dr. Marshall as a result of a policy at Whirlpool whenever there is a disagreement between that attending physician and the plant physician to get in independent medical examination. Marshall dep. at p.. 25. ***On February 19, 2009, as a result of a visit between Plaintiff and Dr. Marshall, Dr. Marshall noted that he disagreed with Dr. Issa's position that Plaintiff could be returned to work in the plant and reviewed in his notes further episodes of what had happened in the plant and noted that Dr. Issa's opinion did not change and Dr. Issa still felt that Plaintiff could return to work unrestricted.*** Marshall dep. at p. 29, Plaintiff's Exhibit 58. At that point, Dr. Marshall decided to write Dr. Biswas to fill him in on additional information and see if he would change his opinion at that point in time. Marshall dep. at p. 30.

**HARIDAS BISWAS M.D. (I.M.E. Cardiologist)**

Dr. Biswas, in his deposition of December 3, 2009, testified that he is an internal medicine and cardiovascular disease specialist. Biswas dep. at p. 6. Dr. Biswas testified that he was not familiar with the Whirlpool plant in Clyde, Ohio. Biswas dep. at pp. 9-10. Dr. Biswas did not recall having reviewed any medical records or a cardiac cath for Mr. Wurzel prior to meeting with him. Biswas dep. at pp. 12-13. Dr. Biswas conducted an examination of Plaintiff on November 13, 2008. Biswas dep.

8

at p. 25. Dr. Biswas noted that in his first report back to Whirlpool, he noted that if somebody has Prinzmetal angina, on medications, usually they can go back to work and do everything they want to with no restriction. Biswas dep. at p. 33. He stated that he felt the Plaintiff's condition was controlled as of November 13, 2008. Biswas dep. at p. 34. Dr. Biswas noted that in Dr. Marshall's letter to him dated February 19, 2009, Marshall reported that Wurzel had six documented episodes, and that in one of those episodes, he had taken nine nitroglycerin with no relief. Biswas dep. at p. 37. Relying on Dr. Marshall's letter to him describing the subsequent events and noting that Plaintiff worked around machinery out of the line of sight of others, he concluded that Plaintiff's symptoms could be quite serious. Biswas dep. at pp. 43, 44. Dr. Biswas did note that Dr. Marshall did not communicate what was happening at the plant with Drs. Issa and Stockton. Biswas dep. at p. 49. Dr. Biswas noted that his recommendation that Plaintiff work only under close supervision and avoid working close to potentially risky areas was based only on paperwork that he had received. Biswas dep. at p. 55. He noted that "you have to see the patient directly, and then you have to investigate, as necessary, investigate that, and then you can change your–the diagnosis to take in everything like that..." Dr. Biswas testified that he had only one actual interview with Mr. Wurzel and that after this interview he issued the return to work letter to Dr. Marshall. This was in November of 2008. Biswas dep. at p. 61. Before changing his recommendation, so as to recommend restrictions, Dr. Biswas did not interview Plaintiff again. Rather, he relied on information forwarded to him by Dr. Marshall. Biswas dep. at p. 61. ***Dr. Biswas testified that a face to face interview with Plaintiff may have affected his recommendation.*** Biswas dep. at p. 62. Biswas also noted that it was the report of increased problems that resulted in the changed recommendations and that he was aware of the fact that Plaintiff worked in a machining factory and machine environment at the time he wrote his first report in November of

9

2008 recommending that Plaintiff be returned unrestricted. Biswas dep. at pp. 63, 64.

**<u>ADDITIONAL FACTUAL ISSUES</u>**

Although Plaintiff suffered his first spasm on April 20, 2003, he was not diagnosed with Prinzmetal Angina until November 2, 2007. Wurzel dep. at pp. 44, 60. He drove tow motor during all of that time while suffering from spasms prior to his diagnosis. Plaintiff was taken twice to the hospital from Whirlpool by EMS during those four years. He went home on FMLA, returned to work, and continued driving the tow motor without incident. No concern was expressed by Defendant during that time. After Plaintiff was diagnosed with prinzmetal angina in November of 2007, his tow motor license was suspended on March 14, 2008. This suspension was nearly five years after the onset of spasms, a period of time in which Plaintiff did not have any accident and in which he did not drop any parts. Wurzel dep. at p. 129-131.

As to Defendant's Statement of Undisputed Facts, Plaintiff notes that all machines and assembly lines are equipped with emergency stop buttons, light curtains, and emergency pull cords that shut off all movement of line and machinery at that exact moment. Plaintiff states that he never met with Dr. George Jabaly. Plaintiff further notes that from 2004 until March 10, 2008, he was able to use Family and Medical Leave without interference. Plaintiff notes that he never gave written or verbal permission at this time (November of 2007) for Dr. Marshall to disclose any of his medical information to anyone including Dr. Roush. He contends that such contact by Defendant was in violation of HIPPA law. Plaintiff gave permission to Dr. Marshall to disclose medical information on October 2, 2008, nearly one year later. Plaintiff notes that currently the gatekeeper job in the plant is still in place and was recently put up for bid and was filled. Plaintiff also contends that he informed Dr. Issa about all of his spasms as this is pertinent to his survival. On September 25, 2008, Plaintiff was a successful bidder

on a job that was to start on September 29, 2008. He had a spasm on September 26, 2008, went home on FMLA, was called at home and told that he could not return to work until he saw the company doctor and Barbara Dewey informed Plaintiff that his bid had been taken away. Wurzel dep. at p. 178. At this time, Plaintiff testified that he was having spasms on a monthly basis. Wurzel dep. at pp. 180, 184. Dr. Marshall saw Plaintiff on October 2, 2008 and held him out until he saw his cardiologist. Wurzel dep. at p. 186. Dr. Marshall returned Plaintiff to work on October 7, 2008 but kept his restriction on driving intact. Wurzel dep. at p. 190. Thereafter, on October 8, 2008, Carol Wasserman called Plaintiff at home at 11:30AM and told Plaintiff that he had three options; there were two jobs that he could bid on or he could be laid off. Wurzel dep. at p. 191. Plaintiff was told that if he did not bid that day by 1:00PM, he would be laid off. Plaintiff bid and received the job. Plaintiff returned to work on his new job on October 13, 2008 in the paint department where there are numerous conveyor systems continuously moving–all despite Defendant's statements that its concerns about Plaintiff's safety motivated its actions. Plaintiff contends that after being diagnosed with prinzmetal angina, he was never transported by Defendant to the hospital by EMS. He has attached as Exhibit A Bellevue Hospital Records and EMS records showing ER admissions and showing EMS transport by Whirlpool on August 17, 2004 and October 19, 2007. Plaintiff did not leave Whirlpool by EMS on September 5, 2008.

In March or April of 2008, Plaintiff had his meeting with Mark Schulz and Barbara Dewey. Plaintiff testified in his deposition that Shulz stated that he paid Dr. Issa so Issa would tell Plaintiff what he wanted to hear.

After Plaintiff had an angina attach on October 22, 2008, shortly after he was returned to work, Dr. Marshall ordered that Plaintiff have an IME before returning to work. Mr. Wurzel received a letter

11

from Barbara Dewey to that effect. Wurzel dep. at pp. 208-210. Plaintiff's IME exam was with Dr. Biswas as noted above on November 4, 2008. Wurzel dep. at p. 210. As a result of this IME as noted above, Plaintiff was returned to work on December 2, 2008. Wurzel dep. at p. 213. Plaintiff complained in his deposition that when he went home on FMLA (intermittent) he was at this point not being allowed to return unless he saw Dr. Marshall and the IME doctor when his own doctors had cleared him. Wurzel dep. at p. 215. Plaintiff specifically denied as to the attack on February 6, 2009 that he stated that took nine nitroglycerin tablets. Wurzel dep. at p. 226, 234. Nor did he ever tell this to Dr. Marshall. Wurzel dep. at p. 236. Despite being cleared to return to work by Dr. Issa on February 17, 2009, Whirlpool did not let Plaintiff return. Wurzel dep. at pp. 233-234.

## II. ARGUMENT

### A. Claims of Disability Discrimination

#### 1. A triable issue of fact has been presented on whether Plaintiff is disabled.

Plaintiff agrees that federal and state law under disability discrimination are analyzed in like fashion and the ADAAA is not applied retroactively.  The definition of disability under O.R.C. 4112.01(a)(13) and under the ADA includes an examination of the physical or mental impairment and includes an examination of its effects on major life activities. The major life activity of working, under Ohio law, is only one of the major life activities shown. The Defendant simply would have it both ways. First, it seeks to contend that there was no job in the plant that Plaintiff could perform. Having arrived at this conclusion, the Defendant simply put Plaintiff on out of work. Having concluded that Plaintiff was totally disabled , the Defendant out of the other side of its mouth tries to convince this Court that Mr. Wurzel was not disabled because he and Dr. Issa admitted so. In this case, it is submitted that the Defendant clearly regarded Plaintiff as being disabled in the major life activity of

working. It placed restrictions on Plaintiff's performing basically every job in the plant after March of 2008 and held Plaintiff out of work. This is not a case in which Plaintiff was not able to perform his assigned job. Rather, the Defendant has gone to lengths to explain that in a plant of this type, there were no positions that would fit his restrictions as placed on him after March of 2008. Ohio Revised Code Section 4112.01(A)13 and the ADA also provides that an individual can be disabled by virtue of a record of impairment. In this case, Defendant was aware of Plaintiff's long history of spasms dating back to 2003. Once Plaintiff was diagnosed with prinzmetal angina, the Defendant disregarded the clear directives of his treating specialists and started intervening by using its general practice plant physician to override Plaintiff's specialists and utilize an IME doctor who did not have adequate information about either the plant or Plaintiff's conditions to render an appropriate opinion. In *Justice vs. Crown Cork & Seal Co.*, 527 F. 3d 1080 (10th Cir. 2008), the Court reversed summary judgment in favor of the employer, holding that there was a triable issue of fact as to whether plaintiff posed a direct threat to plant safety. That case involved reassignment to janitorial work. There, the Court held that a triable issue of fact existed as to whether the plaintiff actually posed a direct threat, in light of evidence that the employer's interpretation of the medical exams may have been unreasonable. The Court held that a reasonable jury could conclude that the likelihood of harm was extremely small and that, therefore, the plaintiff did not pose a direct threat. See also *EEOC v. Burlington Northern & Santa Fe Railway Co.*,____F. Supp. 2d____, 2009 WL 1538156 (W.D. Tenn. June 3, 2009), where summary judgment was denied where the employer relied upon the opinion of medical specialists who failed either to examine the employee directly or to consult with his physician. In this case, Plaintiff's history of spasms was ongoing and of a long term duration. They started in 2003 and were diagnosed in November of 2007. As to the acts that took place subsequent to January 16, 2009, the date of the

13

ADAAA, Plaintiff notes that the ADAAA defines disability to include impairments that affect a broader spectrum of major life activities, including circulatory, respiratory, endocrine and cardiovascular functions. The ADAAA provides that the positive effects from an individual's use of one or more mitigating measures is to be ignored in determining if an impairment substantially limits a major life activity. Also, the negative effects from use of a mitigating measure, such as medication, can be evaluated to determine whether there is a disability. Episodic impairments and impairments in remission can also be considered in determining whether there is a disability. See proposed regulation 29CFR Section 1630.2 (j)(4). Under the ADAAA, when someone is substantially limited in the major life activity of working, the new law provides that the impairment limits that major life activity of working when it substantially limits an individual's ability to perform or to meet the qualifications for a "type of work." This replaces the class or broad range of jobs language contained in the 1991 regulation. As to the "regarded as" prong of the disability, under the ADAAA, an employer "regards" and individual as having a disability if it takes an action prohibited by the ADA based on an individual's impairment or an impairment the employer believes the individual has, unless the impairment is transitory (lasting or expected to last six months or less) and minor. No longer does one have to show that the employer believed the impairment or perceived impairment substantially limited performance of a major life activity. See proposed regulations 29 DFR 1630.2(l) and 1630.2(o)(4). See generally 29CFR Section 1630.

### 2. Plaintiff can safely and substantially perform the essential functions of the job.

The See e.g, *Smith v. Henderson*, 376 F.3d 529 (6th Cir. 2004). See also *Kiphart v. Saturn Corp.*, 251 F.3d 573, 251 F.3d 573 (6th Cir. 2001). In *Fenney v. Dakota, Minnesota & Railroad Co.*, 327 F.3d 707 (8th Cir. 2003, the Court noted that although plaintiff retains the ultimate burden of

proving that he is a qualified individual, the employer must show which functions are essential. In this case, the Defendant has categorically banned Plaintiff from work within the plant, despite his medical evidence to the contrary and despite his history of accident free ability to perform.

### B. Intentional Infliction of Emotional Distress

In this case, it is submitted that the long pattern of activity designed to keep Plaintiff out of the workplace as noted above rises to the threshold of this tort.

### C. Negligent Hiring, Retention and Supervision

Plaintiff states that the acts of driving him out of work and out of a job after years of permitting him to work with knowledge of the nature of his physical problem in violation of Chapter 4112 of the Code by persons purportedly trained in personnel establishes incompetence. Their actions in keeping Plaintiff out of work foreseeably resulted in his losses all despite his clear medical evidence.

### D. Family and Medical Leave Act

Although the Defendant granted Plaintiff intermittent FMLA leave, it periodically chose to ignore his return to work medical evidence which he presented from his experts, causing delays in returning him and counting the delays against him. Plaintiff's right to return to the workforce on an unrestricted basis was interfered with as a result of the actions complained of above.

## III. Conclusion

For the reasons set forth in this memorandum, supra, the Defendant's Motion for Summary Judgment ought to be overruled.

    Respectfully submitted,

    **WASSERMAN, BRYAN, LANDRY & HONOLD, LLP**

    s/Francis J. Landry
    Francis J. Landry

15

        Attorney for Plaintiff

### NOTICE OF SERVICE

This is to certify that the foregoing Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment was filed electronically on March 1, 2010. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

        s/Francis J. Landry
        Francis J. Landry