IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Brian Wurzel,                                                                                        Case No. 3:09CV498

           Plaintiff

    v.                                                                                                        ORDER

Whirlpool Corporation,

           Defendant

This is an employment discrimination case. Plaintiff's amended complaint asserts claims under the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq*. (ADA), the Family Medical Leave Act, 29 U.S.C. §§ 2615, 2617 (FMLA), and state law statutory disability act, O.R.C. § 4112.02(A). It also asserts tort law claims for intentional infliction of emotional distress and negligent hiring, retention and supervision.[1]

The defendant Whirlpool Corporation, has filed a motion for summary judgment. (Doc. 29). For the reasons that follow, the motion shall be granted.

---

[1] Plaintiff's opposition to defendant's motion for summary judgment does not adequately respond to defendant's arguments as to plaintiff's FMLA, intentional infliction of emotional distress and negligent hiring, etc., claims. His response is insufficient, as he merely rests on generalized, conclusory allegations, without submitting evidence in support of those claims. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 322, 324 (1986) (holding that Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position). Those claims are, accordingly, deemed abandoned.

**Background**

Plaintiff began working at Whirlpool around March, 1983. When the incidents giving rise to this lawsuit began, plaintiff was working as a Materials Handler. His principal assignment at that time was driving a tow motor.

To do his job delivering items throughout the plant, plaintiff drove on walkways also used by other workers who were walking or operating tow motors.

In mid-May, 2003, plaintiff reported to the Employee Health Center (EHC) and informed the plant physician, Dr. George Jabaly, that he had nearly lost consciousness twice because of chest pain and often felt weak and dizzy. Dr. Jabaly told plaintiff he could not return to work until he saw his doctor. To enable plaintiff to do so, he was granted FMLA leave for the ensuing nine day absence.

Plaintiff's doctor, Dr. Hiestand, initially described as spasms of stable angina, a condition which, according to the doctor, would last plaintiff's lifetime. Dr. Hiestand released plaintiff to return to work without restrictions.

Thereafter, defendant granted intermittent periods of FMLA leave.

In November, 2007, plaintiff was diagnosed with Prinzmetal angina, which causes coronary artery spasms without warning. Plaintiff's cardiologist, Dr. Mark Issa, has reported that neither the occurrence nor severity of the spasms is predictable.

Depending upon the severity of the spasms, plaintiff can experience tightness in his chest, shortness of breath, left arm numbness, dizziness, and fatigue. He relieves his symptoms with Nitroglycerin tablets (Nitro) in varying amounts depending on the severity of the symptoms.[2]

Plaintiff's treating physician has advised him to go to an emergency room if, after taking three Nitro tablets, his symptoms are not relieved within fifteen minutes.

After being diagnosed with Prinzmetal angina, plaintiff met with the company doctor, Dr. Robert Marshall, on November 8, 2007, in the EHC for a return to work evaluation. Among his other duties, Dr. Marshall evaluates employees or prospective employees to confirm they can perform the jobs Whirlpool is asking them to do. In the company's view, plaintiff's Prinzmetal angina raised safety concerns.

Plaintiff told Dr. Marshall about the diagnosis of Prinzmetal angina and his use of Nitro to relieve his symptoms.

Dr. Roush, one of the plaintiff's treating physicians, had released plaintiff to return to work without restriction. Dr. Marshall contacted Dr. Roush to confirm that Dr. Roush understood plaintiff's job duties. Dr. Roush assured Dr. Marshall that plaintiff could safely drive a tow motor. Dr. Marshall returned Plaintiff to work without restrictions.

On March 11, 2008, plaintiff experienced an angina spasm, reported to the EHC and then went home because he was fatigued and concerned about safely driving a tow motor. Two days later plaintiff reported to Dr. Marshall for a return to work evaluation.

---

[2] Nitro lowers blood pressure; side effects can include headaches, hypotension, dizziness, and lightheadedness.

3

Plaintiff told Dr. Marshall he had had two attacks back-to-back, but they had been resolved within a few minutes of taking Nitro. Dr. Marshall asked plaintiff to see Dr. Issa to confirm that plaintiff was stable, not a safety risk and able to return to work.

When later that day plaintiff saw Dr. Issa, he did not tell Dr. Issa about his back-to-back spasms or having left work early due to fatigue and concern about driving his tow motor safely.

Instead, plaintiff told Dr. Issa that he rarely experienced angina spasms, and when he did, they were relieved promptly with Nitro.

Plaintiff did not tell Dr. Issa about the type of vehicle or machines he operated. Dr. Issa was otherwise unfamiliar with the work environment at the plant.

On the basis of what plaintiff had told him about his spasm and the effect of Nitro, and unaware of the information plaintiff had provided, Dr. Issa released plaintiff to return to work without restrictions. In Dr. Issa's view at the time, plaintiff was no more at risk for sudden incapacitation than any other patient "being treated for angina."

Despite Dr. Issa's release of plaintiff to return to work, Dr. Marshall remained concerned about the possibility that plaintiff was at risk for sudden incapacitation when compared with persons not afflicted with angina.[3] Dr. Marshall did not believe Plaintiff could safely operate a tow motor. Marshall Dep. Aff. 5.  Thus, Dr. Marshall, with his first-hand familiarity with the plant working environment and plaintiff's job duties, allowed plaintiff to return to work, but not to drive a tow motor or other company vehicles.

---

[3] Dr. Issa acknowledged at his deposition that persons with angina are more at risk of sudden incapacitation than persons without that condition.

Because he could not drive a tow motor, plaintiff could not remain working as a Materials Handler. He had to bid on another position.

Around March 15, 2008, Whirlpool temporarily assigned plaintiff to work as a gatekeeper/tolltaker until he could successfully bid on a permanent position.

During the following months, plaintiff experienced an increasing number of angina spasms at work:

- On June 10, 2008, plaintiff had his fifth angina spasm in four days. His supervisor, helped him to the EHC, after which plaintiff went home due to lightheadedness.

- On June 17, plaintiff's supervisor again brought him to the EHC after an angina spasm; plaintiff's pulse was rapid, he experienced another spasm after arriving at the EHC and asked to go home.

- On August 4, plaintiff nearly passed out at his work station.

- On August 6, plaintiff was "doubled over" on a bench and ready to pass out. His wife took him home.

- On September 5, plaintiff's supervisor took him to the EHC after a spasm. Plaintiff was red in the face and short of breath and left the EHC in an ambulance when he did not recover after twenty minutes.

- On September 26, plaintiff's supervisor again took plaintiff to the EHC after plaintiff had experienced another spasm and had taken three Nitros. Dizzy and fatigued, plaintiff went home.

Thereafter, the Human Resources Administrator in charge of the EHC, Barbara Dewey, told plaintiff that Dr. Marshall had to clear him to return to work.

About a week after the September 26th spasm, on October 2, 2008, plaintiff met with Dr. Marshall for a return to work evaluation. He gave Dr. Marshall a return to work verification from Dr. Roush. Dr. Roush noted plaintiff could return to work without restrictions. He also stated

5

plaintiff was at no greater risk for sudden incapacitation than "any other patient being treated for angina."

As before, Dr. Marshall remained concerned about the possibility that plaintiff's angina could still cause sudden incapacitation. Consequently, Dr. Marshall followed up with Dr. Issa on October 6, 2008.

During their conversation, Dr. Issa assured Dr. Marshall that plaintiff could return to work. He gave no confirmation, however, that plaintiff, in light of his angina, was not at risk for sudden incapacitation.

Dr. Issa later testified that, had he known that plaintiff's spasms could cause him to experience dizziness, fatigue, and lightheadedness, his view about plaintiff's ability to return to work would have differed.

On October 7, 2008, Dr. Marshall released plaintiff to work. Because Dr. Marshall did not believe plaintiff could safely drive a tow motor, however, he refused to release plaintiff for that job unless plaintiff had a six-month spasm-free period.

The following day, October 8, 2008, plaintiff bid on an available Multi-Process Team Member position in the Paint Department. His bid was successful, and he began working in that position around October 13, 2008.

Plaintiff's duties included inspecting washer cabinets and lids to ensure the finish was proper, transferring cabinets if they needed to be painted a different color, and tooling, which involved placing parts on a conveyor line so that they could go through the paint systems, and then removing the parts from the conveyor line on completion. While "tooling," the conveyor line is low-hanging and moves continuously.

6

Employees in that job perform each duty on a rotating basis, changing locations each half hour. Plaintiff worked one of the rotations alone on an upper floor.

Three days after starting his new job, on October 16, 2008, plaintiff had an angina spasm. On reporting to the EHC, plaintiff was pale and uncomfortable. An ambulance took plaintiff from the EHC to an emergency room.

Less than a week later, on October 22, 2008, plaintiff had another angina spasm. He spent about thirty minutes in the EHC, after which his wife drove him home.

Following these episodes, Doris Yontz, a registered nurse in the EHC, told plaintiff he could not return to work until cleared by Dr. Marshall.

Given the conflict between his continuing concerns about the possible effects of plaintiff's spasms on his safety and that of others and Dr. Issa's position the plaintiff could do his job, Dr. Marshall ordered an independent medical examination (IME) of plaintiff.

Dr. Haridas Biswas, a cardiologist, conducted the IME on November 13, 2008. Before the examination, Dr. Marshall informed Dr. Biswas about plaintiff's condition and symptoms. He asked whether plaintiff endangered his safety or that of others.

Plaintiff told Dr. Biswas that he rarely experienced angina spasms, and when he did, Nitro quickly relived the symptoms. He also denied experiencing dizziness.

Having thus received a partial picture, Dr. Biswas recommended that plaintiff be returned to work with no restrictions

Dr. Marshall accepted Dr. Biswas's recommendation and authorized Plaintiff to return to his position in the paint department.

About two months later, on January 22, 2009, plaintiff had another spasm. An ambulance took him to the EHC. He complained of fatigue and went home after thirty minutes in the EHC.

Nine days later, on January 30, 2009, plaintiff asked the EHC to check his blood pressure because he had taken a Nitro tablet *en route* to work. He was dizzy and fatigued. When those symptoms did not subside, his daughter drove him home.

A week later, on February 6, 2009, plaintiff again reported to the EHC after an angina spasm. He had taken two Nitro tablets and was pale and fatigued. Plaintiff reported that there were days when he had taken nine Nitros. After fifty minutes in the EHC plaintiff went home.

A week thereafter, on February 13, 2009, plaintiff saw Dr. Issa about returning to work. Though he told Dr. Issa that he had had spasms at work, he also stated that Nitro relieved the symptoms within three minutes.

Plaintiff did not tell Dr. Issa about his dizziness and fatigue, having once had to be carried in an ambulance to the EHC, or having to remain in the EHC for between twenty and fifty minutes to recover.

Not having these details, Dr. Issa again authorized plaintiff's return to work without restrictions.

In the meantime, plaintiff had also been seeing Dr. Frederick Stockton. Like Dr. Issa, Dr. Stockton is a cardiologist.

In 2007, Dr. Stockton had diagnosed plaintiff's condition as Prinzmetal angina involved. In his view, chest pain and breathlessness are often associated with this condition

Dr. Stockton next examined plaintiff on February 17, 2009. He placed no limitations on plaintiff from a cardiac standpoint. Likewise, in his view as of that date there were no work-related restrictions.

During his deposition, Dr. Stockton stated that if the plaintiff had told him that he was taking up to nine nitroglycerin tablets on a given day, his opinion would have been unchanged, except to cause him to encourage plaintiff to quit smoking and adjust his medications.

Like Dr. Issa, Dr. Stockton was unaware of plaintiff's job duties and associated working conditions. Nonetheless, in his opinion, from a "cardiac standpoint, plaintiff could do "any job in the world, including flying a plane or driving a bus."

On February 19, 2009, two days after seeing Dr. Stockton, plaintiff again saw Dr. Marshall. Dr. Marshall doubted that Dr. Issa understood the risks present in the Whirlpool plant. Though Dr. Issa, like Dr. Stockton, may have believed, from a cardiac standpoint, that plaintiff could safely return to work, Dr. Marshall felt obliged to consider the work environment and plaintiff's job duties in deciding whether plaintiff's condition and its effects created a safety risk.

In light of his concerns and all the circumstances, Dr. Marshall decided that plaintiff could not work around machinery, at heights, or drive company vehicles. This meant plaintiff could not return to the Paint Department with its heights, low-hanging conveyor lines and moving machinery.

At this point, plaintiff was on sick leave.

On February 19, 2009, Dr. Marshall wrote Dr. Biswas, notifying him of the frequency and severity of the spasms following the IME. Dr. Marshall pointed out that in his regular duties, Plaintiff worked near machinery and out of the sight of others. He asked Dr. Biswas if this information altered his original opinion.

9

On March 5, 2009, Dr. Biswas responded, stating that plaintiff's symptoms appeared to pose some risk for his health. Dr. Biswas recommended plaintiff be kept off work unless he could work under close observation.

Dr. Biswas was concerned about plaintiff's safety and the possibility of a fatality since Plaintiff sometimes worked alone. He was also concerned because angina and use of Nitro can cause a patient to pass out.

Dr. Biswas, who had not seen the records plaintiff's treating doctor, Dr. Issa , expressed no opinion as to why Dr. Issa believed plaintiff could return to work without any restrictions.

Dr. Marshall gave Dr. Biswas the applicable records.

Dr. Biswas wrote Dr. Marshall on May 8, 2009, stating that it appeared Drs. Issa and Stockton who were of the view that plaintiff's condition was mild and relieved with Nitro, were unaware of the severity of the plaintiff's spasms.

On June 11, 2009, Dr. Marshall again wrote Dr. Biswas to obtain clarification regarding the restrictions Dr. Biswas recommended (namely, that plaintiff work "under close observation").

On June 17, 2009, Dr. Biswas clarified that "working under close observation" meant Plaintiff should not work alone near areas with an assembly line or moving machinery. He also stated that "potentially risky area" would include moving objects or moving machinery and being around water, pools, etc.

Dr. Biswas reiterated that this meant that plaintiff should work with fellow employees, and not alone in a position at an assembly line with moving machinery. Dr. Marshall adopted Dr. Biswas's restrictions.

10

Thereafter, following a "restriction review" on August 6, 2009, Whirlpool determined that plaintiff could not safely perform the essential functions of his Paint Department job in light of the fact that during one of the rotations he worked alone outside the presence of other employees.

On August 13, 2009, Marc Schulz, Human Resources Generalist, Ms. Dewey, and Dr. Marshall met with plaintiff. They discussed the correspondence between Drs. Marshall and Biswas, the resulting restrictions and the result of the restriction review and the determination plaintiff could not safely perform the essential functions of the Paint Department position.

He told plaintiff he could bid on any position that he believed met his restrictions. If on the basis of restriction review, Whirlpool determined he could safely do the essential functions of the position, it would be his. Otherwise, he was to remain on sick leave unless he could confirm that he had been spasm-free for six months.

Plaintiff acknowledged he had not been spasm-free for six months. Mr. Schulz then told plaintiff he could remain on sick leave for a two years. But only the first twenty-six weeks of sick leave are paid. As of the date of that meeting, plaintiff had exhausted his paid sick leave.[4]

## Discussion

At bottom, this suit results from the fact that plaintiff's treating physician, Dr. Issa, along with Dr. Stockton, have stated he could return to work without restriction, while Whirlpool's plant doctor and an independent medical evaluator concluded that his angina and its effects make it unsafe for him to work alone, around moving machinery or as a tow motor operator.

---

[4] Plaintiff returned to work on March 1, 2010, his spasms having, apparently, become controlled through medication.

Plaintiff disregards the undisputed (and, in my view, crucial, if not dispositive) fact that he failed to tell either Dr. Issa or Dr. Stockton several pertinent details. Most importantly, it is clear that neither of those doctors knew about the severity of the symptoms plaintiff was experiencing when he suffered an angina spasm.

Dr. Marshall, in contrast, was well aware of those symptoms, and took them into account when deciding whether plaintiff could safely perform his assigned duties.

### 1. Disability Discrimination

Analysis of plaintiff's disability claims follows the burden-shifting sequence of *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). Thus, plaintiff must first prove a *prima facie* case by establishing that he: 1) suffers from a disability as defined by the ADA; 2) is otherwise qualified to perform the requirements of his position, with or without reasonable accommodation; and 3) was discriminated against because of the disability. *E.g., Williams v. London Util. Com'n*, 375 F.3d 424, 428 (6th Cir. 2004).

If plaintiff establishes a *prima facie* case, Whirlpool has to articulate, but not ultimately prove, a legitimate, non-discriminatory reason for its decision. *Id*. Once Whirlpool does so, plaintiff must produce sufficient evidence to prove that the articulated reason was actually a pretext masking discrimination. *Id.*

#### A. *Prima Facie* Case

##### i. Plaintiff is Not Disabled Under the ADA Or The ADAAA

In 2008, Congress enacted the ADA Amendments Act of 2008, P.L. 110-325 (ADAAA), and changed the definition of "disabled" within the meaning of the ADA. *Milholland v. Sumner County Bd. Of Educ.*, 569 F.3d 562, 565 (6th Cir. 2009). Acts occurring before January 1, 2009, the effective date of the ADAAA are analyzed under the pre-amendment version of the ADA. *Id*.

Some of the acts giving rise to this suit occurred before, and some after the ADAAA effective date. Under both versions, however, plaintiff must establish that he is disabled.

To show that he is disabled, plaintiff must show he either: 1) has a physical or mental impairment that substantially limits one or more of major life activities; 2) has a record of such impairment; or 3) is regarded by Whirlpool as having such an impairment. *Id*. at 565-66.

Plaintiff and Dr. Issa unequivocally deny that plaintiff has an actual disability. He claims, accordingly, that Whirlpool regarded him as disabled: *i.e.*, had the view that he is limited in the major life activity of working.[5]

The pre- and post-amendment versions of the ADA differ with regard to "regarded as" claims.

### a. Pre-Amendment "Regarded As" Claim

---

[5] Plaintiff's opposition to the defendant's motion for summary judgment asserts that he is disabled under the ADA. I disagree: an impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation under the ADA. *See Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 199 (2002); *Mahon v. Crowell*, 295 F.3d 585 (6th Cir.2002). The ADAAA changed the definition of the "regarded as" as a basis for coming within the ADA, and thus abrogated the principal holding of *Toyota* and *Mahon*. The other subsections of 42 U.S.C.A. § 12102(1) remained unchanged. The principal that intermittent impairments, such as those resulting from plaintiff's sporadic angina spasms, are not deemed disabling remains good law.

To prove his "regarded as" claim with respect to Whirlpool's restrictions of his job assignments in 2008, plaintiff must show the company regarded him as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." 29 C.F.R. § 1630.2(j)(3)(i).

Under the former version of the ADA, courts rejected claims based on an employer's determination that a plaintiff was limited in performing a particular position or job, rather than a broad range or class of jobs. *See Sullivan v. River Valley School Dist.*, 197 F.3d 804, 811 (6th Cir. 1999); *Davis v. Mich. Agric. Commodities, Inc*., 2009 WL 94534, *7 (E.D. Mich.).

In this case, Whirlpool was concerned that plaintiff's angina spasms, which were recurrent, unforeseeable and unpredictably incapacitating, made operating a tow motor potentially unsafe for plaintiff and others. His condition and its consequences did not lead Whirlpool to believe he was incapable of performing a large class of jobs.

In *Davis* the plaintiff was afflicted with seizures. This caused the defendant to preclude him from operating a fork truck, a front-end loading tractor, and a railcar mover. The employer still permitted the plaintiff to do other work as a general laborer, and, in time assigned him temporarily to another position. His seizures made him unable to perform his assigned job.

The court in that case, which is in its general aspects similar to this, granted summary judgment to the employer on the basis that it had not regarded the plaintiff as disabled *Id*.

Not being allowed to drive a tow motor or other company vehicle, which was the restriction Whirlpool imposed in 2008, does not encompass a "broad class" of jobs. Thus, Whirlpool did not regard Plaintiff as disabled under the pre-amendment version of the ADA.

### b. Post-Amendment "Regarded As" Claims

To prove a "regarded as" claim under the post-amendment version of the ADA, plaintiff must show he was "subjected to an action prohibited under [the ADAAA] because of an actual or perceived physical or mental impairment whether or not the impairment limits a major life activity." 42 U.S.C. § 12102(3)(A) (2009).

To meet this burden, plaintiff must show that Whirlpool subjected him to a prohibited action. As discussed below, because a rational jury could only find that concerns with plaintiff's own safety and that of his co-workers prompted Whirlpool's decisions. Actions motivated by *bona fide* concerns with worker safety cannot be deemed or found to be prohibited under the ADA, as amended or otherwise.

### ii. Qualified to Perform Job Requirements

Whirlpool argues that plaintiff cannot meet the "qualified" element of a *prima facie* case because his condition and its potential consequences, as witnessed by Whirlpool's EHC personnel and confirmed by its company doctor and an independent medical examiner, created a direct threat to his safety and that of others.

The applicable regulation defines a "direct threat" as "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. 1630.2(r). Where the perceived threat to safety arises from an employee's medical condition, determination of whether that condition constitutes a direct threat "shall be based on reasonable medical judgment that relies on the most current medical knowledge and/or the *best available* objective evidence." *Id*. (emphasis supplied).

15

Factors to consider include: 1) duration of the risk; 2) nature and severity of the potential harm; 3) likelihood that the potential harm will occur; and 4) imminence of the potential harm. Id.

In this case, Whirlpool based its assessment on the best available objective evidence, as manifest in the observations of the extent of plaintiff's incapacitation resulting from the onset of angina spasms in the workplace.[6] Assessment of all pertinent factors confirms Whirlpool's refusal to let the plaintiff retain his position in the Paint Department.

### a. Duration

Prinzmetal angina is a life-long affliction. This makes the risks that its spasms create unlimited.

Whirlpool correctly argues that the duration of a risk is not measured simply by how long the symptoms of an individual spasm last. The duration of the risk depends, rather, on the longevity of the underlying condition, not the actual or relative brevity of its sporadic consequences, and the danger that those consequences pose while they are manifest.

Here a rational jury could only find that the period of incapacitation resulting from an angina spasm would often be long enough to create a risk that plaintiff would lose control of himself or machinery he may be operating.

### b. Nature and Severity of Potential Harm

Were plaintiff to suffer a spasm while driving a tow motor or working alone in proximity to moving machinery or at a height from which a fall could cause injury, the consequences for his own well-being and others can hardly be disputed.

---

[6] Plaintiff's omission of several pertinent details from his descriptions to Dr. Issa of his condition and its consequences justifies Whirlpool's disregard of his release of the plaintiff to return to work without restrictions.

### c. Likelihood of Potential Harm Occurring

Given the unforeseeability of a spasm and the unpredictability of its effects, the odds are great that, were plaintiff to have continued to drive a tow motor or work near moving machinery or at a height and alone, he or someone else would have been injured.

This calculation is not subject to scientific measurement. Likelihood is not the same as certainty. Under all the circumstances known to Whirlpool, no rational jury could find anything other than that the likelihood of harm was sufficiently great as to justify Whirlpool's concerns and actions.

Plaintiff's argument that a future occurrence was not likely because nothing had happened in the past is off point. Should the nearsighted drive without glasses because they have yet to run into something or somebody?

An employer need not wait to respond to risk of harm until someone is hurt. *See Garner v. Gwinnett County*, 1998 WL 1048471, *4 (N.D.Ga.), *aff'd*, 170 F.3d 189 (11th Cir 1999) (Table) ("The ADA did not require defendants to ignore this information, rely on the conflicting medical opinions of plaintiff's therapists, and take the risk that plaintiff would injure his co-workers or a member of the public once reinstated.").

### d. Imminence of the Potential Harm

Whirlpool claims that, when it placed plaintiff on leave in February, 2009, the potential harm was imminent. It cites several cases, all involving workers with seizures, in support of its claim of imminence: *Moses v. Am. Nonwovens, Inc*., 97 F.3d 446, 447-48 (11th Cir. 1996) (plaintiff with uncontrolled seizure disorder worked near dangerous machines); *Washington v. Occidental Chem. Corp*., 24 F. Supp 2d 713, 728 (S.D. Tex. 1998) (plaintiff not qualified to operate heavy machinery

17

in petrochemical plant); *Davis, supra,* 2009 WL 94534, *7 (plaintiff's operation front end loader, and forklift was inherently dangerous).

While the risk of injury in this case might not have been in every instance and at every moment immediate, it was sufficiently likely to occur that at any given moment it might have been imminent, as the law understands that term in this context.

### iii. The Consequences of Plaintiff's Condition, Not the Condition Itself, Motivated Defendant's Decisions

The ADA prohibits discrimination based on stereotypes (*i.e.*, adverse action simply on the basis of the person's disabling, or perceived disabling condition). The Act does not, however, bar acting when that condition leads to harm or risk of harm. *See EEOC v. Kinney Shoe Corp.*, 917 F. Supp. 419, 431-32 (W.D. Va. 1996).

In *Kinney Shoe* the court held that the employer did not violate the ADA by firing an epileptic employee whose seizures made his working in the store unsafe. The employer, the court concluded, was reacting to the potentially harmful consequences of the plaintiff's condition, and not on the basis of bias against persons with epilepsy. Id.

Similarly, in *Brohm v. J. H. Properties, Inc.*, 149 F.3d 517, 521 (6th Cir. 1998), the Sixth Circuit upheld a hospital's termination of an anesthesiologist whose sleep disorder caused him to fall asleep on the job. Had the disorder not impaired the plaintiff's performance and the well-being of his patients, he would not have lost his job.

The same is true here. A rational jury could only find that Whirlpool's decisions had nothing to do with the diagnosis of Prinzmetal angina and everything to do with the consequences of that condition when it unforeseeably caused spasms of unpredictable duration and effects.

### B. Pretext

Although the parties do not address the issue of pretext, but focus their attention exclusively on the issue of plaintiff's *prima facie* case, I will examine the record as to that issue. In doing so, I assume, *arguendo*, that plaintiff could establish a *prima facie* case.

The gravamen of Whirlpool's case is that it relied on Dr. Marshall's medical judgment that plaintiff's recurrent, unforeseeable spasms created a risk of physical injury to himself and others.

The only evidence plaintiff offers to contradict that contention is the opinions of Drs. Issa an Stockton. Aside from the fact that those opinions were based on incomplete information, the law is clear that a court will not second-guess an adverse employment action where that action rests on an employer's assessment of conflicting evidence. *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998) (holding that "the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action") Neither I nor a jury is charged with, or has the authority to assess *de novo* which medical judgment is more likely accurate.

At this stage, rather, the issue for court and jury is whether the proffered reason – the effect of plaintiff's undisputed medical condition – was the true reason for defendant's decision, or is offered simply as a pretext to mask discriminatory motive. *Id.* at 806.

Plaintiff has produced no evidence beyond his *prima facie* case showing that Whirlpool's articulated reason is a pretense. He cannot, accordingly, meet his burden of showing pretext. *Id.* at 807.

## Conclusion

The defendant is entitled to summary judgment. Plaintiff cannot establish a *prima facie* case that he was either disabled or Whirlpool regarded him as disabled when it restricted his work

assignments. Even if he could, plaintiff cannot prevail on any contention that the reasons Whirlpool expresses for those decisions are pretextual.

It is, accordingly

ORDERED THAT defendant's motion for summary judgment (Doc. 29) be, and the same hereby is granted.

So ordered.

s/James G. Carr
James G. Carr
Chief Judge